298 S.E.2d 906

**J.M. Yasa REDDY, M.D.**

v.

**COMMUNITY HEALTH FOUNDATION OF MAN, etc., et al.**

**No. 15453.**

Supreme Court of Appeals of West Virginia.

Dec. 15, 1982.

---

James M. Cagle, Charles R. Garten, Jr., Cagle, Garten & Wise, Logan, for appellant.

Edward I. Eiland, Eiland & Bennett, Logan, David T. Kennedy, Thornhill, Kennedy & Vaughan, Beckley, for appellees.

David P. Brown, Kingwood, for amicus curiae Preston Co. Health Council, Inc.

Kevin B. Burgess and Pat R. Hamilton, Oak Hill, for amicus curiae Hygeia Facilities Foundation, Inc.

Larry Harless, Charleston, for amicus curiae Dist. 17 and Local Union 8454, United Mine Workers of America.

NEELY, Justice:

Appellant, Yasa J.M. Reddy, M.D., came to the community of Man, West Virginia in July of 1977 to practice medicine. He began his practice as an emergency room physician at the Man Appalachian Regional Hospital, and began to see private patients using the hospital's inpatient facilities. When, in July of 1978, the hospital closed its inpatient services, Dr. Reddy was obliged to find office space in which to see his patients.

In February of 1979 Dr. Reddy entered into a contract with the Community Health Foundation of Man, West Virginia, Inc., our appellees. The Foundation is a non-profit corporation chartered in 1967 for the purpose of providing good medical services to the Man area. The Foundation runs a clinic in Man that operates both from patient charges and from a federal grant that has provided between 120 and 140 thousand dollars annually over the past four years. The Foundation employs eight doctors, "retains" one, rents space to two more, and supports a staff of 34 lay personnel.

The contract between Dr. Reddy and the Foundation provided that the Foundation was to furnish Dr. Reddy all office space, supplies, instruments, and secretarial and other services necessary to support an orderly and proper practice of medicine. The Foundation agreed to pay Dr. Reddy a fixed amount per office visit at the clinic and per day of inpatient hospital treatment, and in turn, the Foundation became the owner of Dr. Reddy's receivable fees. Dr. Reddy was considered an independent con-

tractor under the contract, which was to expire on 8 February 1980.

On 1 June 1979 Dr. Reddy's contract was amended by a second contract, identical to the first except that it adjusted Dr. Reddy's compensation downward. The Foundation was having trouble collecting its bills, and the doctors were asked to help by reducing their compensation. A third contract, similar to the previous ones, was entered into by the parties on 29 January 1980. This contract once again diminished Dr. Reddy's compensation and, for the first time, included a restrictive covenant.[1] This contract expired on 8 February 1981, and on the following day the parties entered into their fourth contract. The fourth contract also contained a restrictive covenant, identical to the covenant in the third contract. It is this covenant whose validity is disputed before us now. Its terms provide:

Twelfth: *Restrictive Covenant.* The physician covenants and agrees that he will not practice medicine within a radius of thirty (30) air miles of Man, West Virginia, for a period of three (3) years, after the termination of said agreement with the Foundation, which restrictive covenant shall be effective regardless of whether this agreement is terminated by action of either the Foundation or the physician or the expiration of the period provided for therein.

In its decision below, the Circuit Court of Logan County declared the covenant valid and enforceable, and issued an injunction enforcing it in its entirety.

This case presents some perplexing factual problems. The first is that Dr. Reddy was practicing medicine in Man before he solicited the clinic to provide him with office space. He testified that approximately half of his current clinic patients are private patients brought by him to the Foundation clinic from his previous practice. The second is that both before and after signing the restrictive covenant Dr. Reddy worked on a regular basis in the local hos-

---

**1.** In this opinion the terms "restrictive covenant," "anticompetitive covenant," and "covenant not to compete" are used interchangeably to refer to a provision of an employment contract purporting to limit an employee's power, upon leaving his contractual employment, to enter as a competitor into the market in which his former employer does business or practices a trade or profession.

pital's emergency room as an emergency room doctor. At no point did the Foundation or anyone representing the Foundation discourage him from continuing his practice there. Third, Dr. Reddy was not an employee of the Foundation, but was one of two doctors "retained" by the Foundation to supplement its regular staff of eight "employed" doctors. Fourth, the evidence, although not conclusive, does tend to support Dr. Reddy's assertion that he did not read the restrictive covenant at the time he signed the third contract. Dr. Reddy testified that the covenant was pointed out to him first by the other "retained" doctor at the Foundation. He did not believe he had signed such a covenant, which prompted the other doctor to point out the provision to him. Dr. Reddy testified that he immediately requested a meeting and asked to be released from the covenant, and the clinic's administrator corroborates Dr. Reddy's testimony that such a meeting did in fact take place, that at the meeting the reasons for the covenant were explained to Dr. Reddy, and that he was not released from the covenant.

Because the record below was not developed sufficiently to provide a factual basis for a thorough application of our following discussion, this case must be reversed and remanded to the court below for a new trial at which an order consistent with this opinion may be entered.

# I

## UNLAWFUL RESTRAINT AND CONSIDERATION

A number of arguments presented to this Court are without merit, and may be quickly dispatched. The first is appellant's contention that the contract provision is in restraint of trade and is, therefore, unlawful under the West Virginia Antitrust Act, *W.Va.Code*, 47–18–3(a) [1978]. This argument fails to recognize that the phrase "in restraint of trade" is a term of art. Most contracts are deliberately entered into to restrain trade in some fashion. Franchise

agreements, agreements to buy or sell a certain commodity at a specified time and price, employment agreements, agreements between management and unions—all operate as limitations on unrestricted trade without being unlawful restraints.

The old common law rule [2] that a covenant not to compete operates as a restraint on trade, and is therefore void and unenforceable, has been replaced by the modern rule that an anticompetitive covenant will be upheld if supported by consideration, ancillary to a lawful contract, and both reasonable and consistent with the public interest. Annot., 62 A.L.R.3d 1014 (1975). It is axiomatic that an employee's covenant not to compete with his employer is not a *per se* violation of antitrust law, *see*, P. Areeda and D.F. Turner, *Antitrust Law*, vol. III, § 703(b) (1978); S. Williston, *Contracts*, 3rd ed., § 1643 (1972); Note, "The Antitrust Implications of Employee Noncompete Agreements: A Labor Market Analysis," 66 *Minn.L.Rev.* 519 (1982) ("Although the language of the Act clearly supports an argument that enforcement of noncompete agreements violates the antitrust laws, all post-employment restraints litigated under that section have been eventually upheld." *Id.*, 524), and there is no West Virginia authority to support any proposition to the contrary. *See Helms Boys, Inc. v. Brady*, 171 W.Va. 66, 297 S.E.2d 840 (1982); *Environmental Products Co. Inc. v. Duncan*, 168 W.Va. 349, 285 S.E.2d 889 (1981); *Pemco Corp. v. Rose*, 163 W.Va. 420, 257 S.E.2d 885 (1979), all decided without resort to antitrust analysis after the West Virginia antitrust statute was enacted. In fact, as we discuss below, there are situations in which enforceable restrictive covenants are essential to an effective marketplace, not inimical to one.

Equally unsound is appellant's theory that the anti-competition provision fails for lack of new consideration. Although we agree with appellant that the restrictive covenant benefits the Foundation only, we

---

**2.** For a concise discussion of the development of the rule in England, and its transfer to the American continent, *See* H.M. Blake, "Employee

Agreements not to Compete," 73 *Harv.L.Rev.* 625 (1960).

observe that it is not an isolated provision. When Dr. Reddy's contract expired on 8 February 1981 his contractual relationship with the Foundation was severed. The fourth contract, entered into on 9 February 1981 was a new contract. This fourth contract contains mutual promises, and that is adequate consideration on its face.

Appellant's reliance on *Pemco Corp. v. Rose, supra,* to support his argument that there was no consideration is not well taken. In the *Pemco* case the employee substantially relied on an oral employment contract before he discovered the restrictive covenant in a written agreement. His extensive good faith reliance congealed his and his employer's obligations under the oral contract as presented to the employee. In effect the bargain was "sealed" by the employee's reliance on the oral contract. The employer's efforts later to augment this sealed bargain with a restrictive covenant solely benefiting the employer were properly frustrated by this Court.[3] The situation before us now is not analogous. The restrictive covenant in this case was an integral part of the fourth contract at the time appellant entered into it, and as appellant understood it.

 Finally, although Dr. Reddy may have been surprised by the covenant in the third contract, there is no suggestion anywhere in the record that appellant is anything but an intelligent adult who entered into the fourth contract freely. Even if Dr. Reddy had been unaware of the contract terms, in the absence of extraordinary circumstances, the failure to read a contract before signing it does not excuse a person from being bound by its terms. Contracts are reduced to writing so that there can be no subsequent argument concerning the terms of an agreement. A person who fails to read a document to which he places his signature does so at his peril. In any case, the record indicates that the parties entered into the fourth contract freely, knowingly, and in good faith.

---

3. For a similar ruling, returned on similar facts, see *America Credit Bureau Inc. v. Carter,* 11

II

## THE RULE OF REASON

 The oft-stated, in fact axiomatic, rule governing the enforcement of covenants not to compete is that such covenants are subject to the "rule of reason," *Restatement (Second) of Contracts* § 326 (Tent. Draft No. 12, 1977); Blake, "Employee Agreements Not to Compete," 73 *Harv.L.Rev.* 625, 675, 681–84 (1960); 6A A. Corbin, *Contracts* §§ 1390, 1394 (1962 & Supp.1964); 14 S. Williston, *Contracts* § 1647C (3d ed. Supp.1979); Annot., 61 A.L.R.3d 397 (1975); and this Court has expressly adopted the rule of reason as the governing principle in these matters. *Pancake Realty v. Harber,* 137 W.Va. 605, 73 S.E.2d 438 (1953); *O. Hommel Co. v. Fink,* 115 W.Va. 686, 177 S.E. 619 (1932). The rule of reason permeates all of the remaining theories advanced to resolve this dispute: The temporal and geographic limitations drawn in the covenant exist at the mercy of the rule of reason; the alleged irreparable harm to the Foundation is merely an element in the rule of reason calculus; the special nature of a doctor's profession (if any) is a factor that is to be considered in light of the rule of reason; and, the very enforceability of the covenant will stand or fall by the rule of reason. We are, therefore, drawn to an investigation of this rule of reason, and of the several policies and interests that inform its use.

Reasonableness, in the context of restrictive covenants, is a term of art, although it is not a term lending itself to crisp, exact definition. Reasonableness, as a juridical term, is generally used to define the limits of acceptability and thus concerns the perimeter and not the structure of the area it is used to describe. This general observation is nowhere more particularly true than with respect to a restrictive covenant. Once a contract falls within the· rule of reason, the rule operates only as a conclusive observation and provides no further guidance. A court's manipulation of the

Ariz.App. 145, 462 P.2d 838 (1969).

terms of an anticompetitive covenant, where none of its provisions standing alone is an inherently unreasonable one, cannot be accomplished with reasonableness as the standard. It is like being in the jungle—you're either in or you're out, and once you're in the distinction is worthless for establishing your exact location.

In the interest not only of attaining *reasonable* results, but the best available reasonable result as well, courts have pressed the inquiry one step beyond the simple question of reasonableness and have forged a three-dimensional approach refining the rule of reason. This approach looks to the interests of the employer, the interests of the employee, and the interests of society at large. Thus the various, and in some cases overlapping, policy considerations each set of interests entails must be explored before a court can decide whether, and to what extent, a covenant not to compete should be enforced. (If this sounds complicated and sloppy, it's because it is; even a cursory look at the authorities reveals this unhappy circumstance.)

The three-dimensional method of inquiry has been summarized in a leading article: "A restraint is reasonable only if it (1) is no greater than is required for the protection of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public," H.M. Blake, "Employee Agreements Not to Compete," *supra*, at 648. As the writer goes on to acknowledge, there is a "checklist conceptualism," *id.*, at 650, about this formulation that ignores the interdependent, hence foggy, nature of these three inquiries.

The improvement upon the primitive rule of reason that the three-dimensional approach provides does not go so far as to transform the rule of reason into a rule of best result, although it is a step in that direction. The interwoven nature of the inquiries, and their dependence on further considerations of policy and economics, effectively limit the advance to a restatement, albeit with some further definition, of the rule of reason. We know that we are in the jungle, and we now know the cardinal points, but we are more or less still knee-deep in unstructured muck.[4]

The attempt to structure the inquiry has not, to our knowledge, been pressed further by any other court. Although a structured approach to the remaining questions may exist somewhere in the endless authority on covenants not to compete, we have not found it. Because courts will perennially be involved in settling disputes over anticompetitive covenants, it is important that further inquiry be pursued. This is not an inquiry that can be pursued in pure and abstract legal terms, however. One must first consider the social and economic landscape that is the natural habitat of the restrictive covenant.

## III

## THE NATURAL HABITAT

Employers generally seek the protection of restrictive covenants to prevent former employees from competing unfairly against them. "Unfair" in this regard means simply that the competition into which the employee enters has been made possible by an asset provided by the employer. The three assets most likely to be so used are: (1) special information imparted to the employee; (2) good will of customers to whom the employee has been exposed in the performance of his tasks; and, (3) the skills the employee has acquired on the job.

Each of these assets is susceptible to unfair competitive use by an employee to differing degrees. Information, or "trade secrets," present a high risk of unfair conversion by an employee, and "trade secrets" covenants tend to be favored and enforced ruthlessly. Customer contacts

4. Even the courageous compilers of Am.Jur.2d, who prowl with insolent grace through such abstruse realms as Champerty (14 Am.Jur.2d), Fright (38 Am.Jur.2d), and Perpetuities (61 Am. Jur.2d), are able only to state that restrictive covenants are "enforceable if reasonable and supported by valuable consideration." 54 Am. Jur.2d, *Monopolies, Restraints of Trade, and Unfair Trade Practices*, § 543. They then throw up their hands; "There is no inflexible formula for deciding the ubiquitous question of reasonableness. Precedents are of little value ... the question of reasonableness must be decided on an *ad hoc* basis." Id.

present a lesser risk, as Judge Hoover describes in his colorful and much-cited opinion in *Arthur Murray Dance Studios of Cleveland v. Witter*, 62 Ohio L.Abs. 17, 105 N.E.2d 685 (C.P.1952), and skills acquired on the job are only occasionally, and reluctantly, found to be a legitimate basis for upholding a restrictive covenant. *Helms Boys Inc. v. Brady, supra*, (ordinary skills and information acquired on the job held not protectable by restrictive covenant.)

The employee's interest is in mobility, in order that he may find the greatest compensation for his services, either by relocating or by threatening to relocate to force his employer to pay fair wages for his services. The employee's interest should control where the employer is using a restrictive covenant merely to depress the value of his employee's services by binding him to his current job. "[A]n employee's anticompetitive covenant is unenforceable if its true purpose is to repress the employee and prevent him from leaving, rather than to protect the employer's business." Annot., 62 A.L.R.3d 1014, § 24(a) at 1057, (1975). On the other hand, the depressant effect of the covenant not to compete on the employee's value may reflect a legitimate amortization of employer cost in the employee's training.

A recent article has refined the economic analysis of this type of covenant in a way that is helpful to our investigation.[5] The touchstone suggested, through economic analysis, is the extent to which the employee has "paid for" the asset he seeks to use in the competitive market. Trade secrets are very unlikely to have been paid for, and this is reflected by the reluctance of courts to permit their use by former employees in the competitive market. Customer lists, too, are seldom paid for, and courts are therefore reluctant to permit their competitive use. However, the more the relationship between employer and employee looks like an agent-principal or independent contractor relationship, the more the customer list becomes an asset properly belonging to the employee, *see, Welcome Wagon, Int'l,*

*Inc. v. Pender*, 255 N.C. 244, 120 S.E.2d 739 (1961), and the less willing courts become to enforce the contractual covenant. Courts are least willing to enforce restrictive covenants where the employee has learned valuable skills on the job although, as we shall explain *infra*, such covenants may be proper in some circumstances.

While there is some authority for the proposition that an employee's skills can never be the subject of a restrictive covenant, even when acquired through a course of instruction in the employment, *Club Aluminum Co. v. Young*, 263 Mass. 223, 160 N.E. 804 (1928), this is not the better rule. Economic analysis compels the conclusion that restrictive covenants should be upheld where the employee has undergone certain types of training. Restrictive covenant protection is necessary, for example, to encourage efficient and extensive investment in "human capital."[6]

Perhaps the hardest judgment among the many hard judgments to be made in this area is finding the point at which the common and unprotected knowledge and skills one obtains at any job become specific enough to merit protection by a restrictive covenant. The extent to which the training is "paid for" provides a helpful point of entry to resolve this issue.

An employer's unreimbursed expenses have long been considered grounds for enforcement of restrictive covenants. A Louisiana court opinion held that under a statute an employer could properly require his employee to enter into a restrictive covenant if the employer incurred an expense in the advertisement of his business or in the training of the employee, but in the absence of evidence of such expenses the covenant in question was invalid. *McCray v. Cole*, 259 La. 646, 251 So.2d 161 (1971). Professor Corbin makes the correct distinction when he observes:

> [a] coal shoveler may be an exceptionally useful employee because he has a strong back, powerful muscles, and a knack

---

5. P.H. Rubin and P. Shedd, *Human Capital and Covenants Not to Compete*, 10 J. Legal Stud. 93 (1981).

6. *See* G.S. Becker, *Human Capital* (1964).

with tools; but this does not make it reasonable to bind him not to serve a competitor after termination of his employment, even though the strength and skill are developed in the employer's service.

A.L. Corbin, *Contracts,* § 1394.

The process of becoming acclimatized to one's work and gaining experience at it is generally taken into account by the salary scale, since novices are usually paid at a discounted rate. By accepting discounted wages during the term of his or her novitiate, the employee in effect pays for this process. The "novice discount" may be spread over the term of employment, however, so evidence of salary raises may or may not indicate that this process of discounting has occurred. The more profitable, or at least secure, inquiry is into the type of training itself.

Take for example the case of a gas station, whose owner perceives an urgent need for new mechanics in his area. In order to fill this need, the owner approaches a young man who pumps gas and cleans windshields at the station with an offer. The owner will send the man off to the General Motors factory mechanic training school if the man will agree to work for him for five years afterwards. The employee agrees and goes to the training course. The economic analysis proceeds as follows:

> Once the worker has received this training an incentive for opportunistic behavior is created. The worker has an incentive to violate the contract and profit from his training—either by going to work for himself or by going to work for another firm, which will pay him a premium because of the value of his training. In this situation, the worker is attempting to appropriate for himself the value of training for which he did not pay.

P.H. Rubin and P. Shedd, *Human Capital and Covenants Not to Compete,* 10 J. Legal Stud. 93, 97 (1981). If workers in such circumstances could not be held to their contracts, the incentive for management to invest in the needed training would be greatly reduced. An enforceable restrictive covenant, then, would protect the employer against the employee's violating his contract, and would augment the incentive to train workers, and fill the local need for mechanics.

Thus, where a mechanic's assistant has picked up the rudiments of auto repair by hanging around the shop, there should be a very strong presumption that the wage scale has taken the employee's development of those skills into account, and the employee will have therefore "paid" to acquire those skills. Where, on the other hand, an unskilled worker is sent off to Detroit to take a six-month course in car repair, the covenant may be seen as a means for the employer to amortize his investment in the assistant-turned-mechanic by binding him to the employer's gas station.

Courts, for both practical and philosophical reasons, are unwilling to use the remedy of specific performance to force an employee to work at a certain job until the cost of his training is paid. The covenant not to compete is the best alternative: without actually chaining the employee to his oar, the covenant makes the employer's work the most attractive available to the employee. The employee may not immediately compete nearby, and he bears the transaction costs of resettlement as a disincentive to moving to a new job elsewhere. Thus the covenant not to compete provides a mechanism consistent with the economic rationale of contract law: "The creation of incentives for value-maximizing conduct in the future, encouraging a process by which resources are smoothly moved through a series of exchanges into successively more valuable uses." W.Z. Hirsch, *Law and Economics,* 1979, at 95.

The trouble with this arrangement is that at some point the employer will recoup his investment in the employee—the employee will have "paid for" his training—but the covenant may still remain in effect. It is on such occasions that a court faced with such a covenant should use its "blue pencil" to fill in a time when the contract clause should expire.

## IV

## THE MECHANICS OF ENFORCEMENT

■ Courts will inevitably be called on to settle disputes over covenants not to compete—it is the nature of the beast. The covenant not to compete carries within its breast an inherent, and apparently unavoidable, flaw. Employers cannot know exactly to which assets an employee will gain access and must err on the side of breadth in drafting their covenants, since no court has ever enlarged one. Thus, although a covenant may be unenforceable as written, an employer is entitled "to that limited measure of relief within the terms of the noncompetitive agreement which is reasonably necessary to protect [its] legitimate interests, will cause no undue hardship on the [employee] and will not impair the public interest," *Solari Indus., Inc. v. Malady*, 55 N.J. 571, 585, 264 A.2d 53, 61 (1970); *accord, Ins. Center, Inc. v. Taylor*, 94 Idaho 896, 499 P.2d 1252 (1972); *Wood v. May*, 73 Wash.2d 307, 438 P.2d 587, (1968); *see also* J. Grody, "partial Enforcement of Post-Employment Restrictive Covenants," 15 *Colum. J.L. & Soc.Probs.* 181 (1979).

This Court's willingness to "shave" covenants not to compete down to proper proportions (forespoken in *Environmental Products Co., Inc. v. Duncan, supra*, Neely, J., dissenting) attests to our understanding that there is not necessarily a sinister purpose behind an overbroad restrictive covenant. We return to the words of Professor Corbin: "in most cases, the promise is not required by the employer because he is a hardhearted oppressor of the poor. He too is engaged in the struggle for prosperity and must bend every effort to gain and to retain the good will of his customers. It is the function of the law to maintain a reasonable balance, ..." A.L. Corbin, *Contracts*, § 1394 at 89 (1962).

Yet the willingness of any court to allow the employer to enforce only the reasonable terms of an agreement not to compete, or to apply the "blue-pencil" doctrine, severing the unreasonable terms and enforcing the remainder, will necessarily encourage employers to draft overly broad agreements in the belief that most employees will not challenge the agreement, and that if they do, the terms will simply be judicially narrowed. As we have observed, to an extent this is inevitable. The encouragement, however, must be controlled. In crafting rules at the appellate level, courts must always be aware that primary consideration should be given to cases *not* in court. The very success of all courts depends on their effecting equitable voluntary settlements outside of the court system, and upon the incentives predictable judicial rules create for people voluntarily to treat one another in a fair and proper manner. With this in mind, we return to our examination of the rule of reason.

## V

## JUDICIAL REVIEW

■ Any covenant not to compete must first, of course, pass inspection as a provision in a binding contract. If the contractual underpinnings of the covenant are legally sufficient, then the contract is valid, and a reviewing court may begin its rule of reason analysis. But if the entire contract fails, for lack of consideration, fraud, duress, adhesion or other contractual excuse, the covenant is also without effect.

■ When, however, a contract is valid and binding, the rule of reason will determine the enforceability of any covenant not to compete in that contract. Although the rule of reason is too primitive a tool to accommodate with any degree of refinement the competing interests involved in disputes over covenants not to compete, it serves well as a threshold analysis. The threshold analysis is as follows: even when contracts are deemed valid and binding, courts should still approach restrictive covenants with grave reservations, and take a strict view of them on first impression. The covenant in question must be reasonable on its face if judicial scrutiny of it is to continue. If the covenant is unreasonable on its face, then it is utterly void and unenforceable. No court should trouble itself to rewrite an inherent-

ly unreasonable covenant to bring the covenant within the rule of reason.

■■■ A covenant is unreasonable on its face when the restriction is excessively broad with respect to time or area,[7] or if in the circumstances the true purpose of the covenant appears to be merely to repress the employee, and prevent him from leaving, rather than to protect the employer's business.[8] Good faith, on the other hand, is evidence of reasonableness. Therefore, where savage covenants are included in employment contracts so that their overbreadth operates, by *in terrorem* effect, to subjugate employees unaware of the tentative nature of such a covenant, we will find the covenant void. Judicial moulding is a remedy available only to employers who use the covenant reasonably.[9]

■■■ If the reviewing court is satisfied that the covenant is reasonable on its face, hence within the perimeter of the rule of reason, it may then proceed with analysis leading to a "rule of best result." Pursuant to that analysis, the court may narrow the covenant so that it conforms to the actual requirements of the parties.

The employer must first show that he has an interest requiring protection. He may do so by showing that his industry operates in such a way that he could be harmed by employees appropriating trade assets, and by particularizing for the court the trade assets susceptible of appropriation by the employee. The employer must show that the employee has acquired a trade asset for which he has not paid, and the employer must further show how the appropriation of this asset by the employee can injure his business.

■■■ The situations most likely to give rise to such an injury are those where the employer stands to lose his investment in employee training, have his trade secrets or customer lists converted by the employ-

7. Our courts should approach the available authority with respect to time and area limitations with caution. Most other courts fail to use the distinction we have adopted between a threshold inquiry as to the reasonableness of the covenant and a "rule of best result" within the general ambit of the rule of reason. Those courts use rule of reason language well past the threshold inquiry, and their standard of reasonableness for purposes of shaving the covenant to reasonable proportions should not be confused with a standard of "reasonableness on its face" for the purpose of deciding whether the covenant merits further scrutiny.

8. An analogy to this approach can be found in *Board of Education v. W. Harley Miller, Inc.*, 160 W.Va. 473, 236 S.E.2d 439 (1977), where we discussed presumptions regarding the validity of arbitration agreements. In syllabus point 3 of that decision we stated:

3. It is presumed that an arbitration provision in a written contract was bargained for and that arbitration was intended to be the exclusive means of resolving disputes arising under the contract; however, where a party alleges that the arbitration provision was unconscionable or was thrust upon him because he was unwary and taken advantage of, or that the contract was one of adhesion, the question of whether an arbitration provision was bargained for and valid is a matter of law for the court to determine by reference to the entire contract, the nature of the contracting parties, and the nature of the undertakings covered by the contract.

*Id.,* 160 W.Va. at 473–474, 236 S.E.2d at 440–441.

With respect to restrictive covenants, the analogy goes, it is presumed that a restrictive covenant in a written contract was bargained for and that the restrictive covenant was intended to be the exclusive means of resolving the problem of "purloined trade assets"; however, where a party alleges that the restrictive covenant is unconscionable or was thrust upon him because he was unwary and taken advantage of, or that the contract was one of adhesion, the question of whether a restrictive covenant is reasonable and valid is a matter of law for the court to determine by reference to the entire contract, the nature of the contracting parties, and the nature of the undertakings covered by the contract.

9. Professor Blake's superb law review article examines this dilemma and endorses a similar principle:

If the court is persuaded that the employer's policy and practice with respect to employee restraints generally is fair and designed only to protect legitimate interests, the court should tailor the covenant to provide such protection with a minimum burden to the employee. When it seems likely that the employer exacts the restriction for whatever advantage he can get from limiting the employees' mobility and bargaining power, or that he has not accorded employees' interests sufficient weight in devising and administering the restraints, severance should be denied. Courts should not aid and abet a grasping or negligent employer by reforming an unreasonably restrictive agreement.

Blake, *supra,* at 683–684.

ee, or have his market share threatened by the employee's risk-free entry into the employer's market. These examples are not intended, however, as an exhaustive list; the central inquiry must always be the extent to which the employee may unjustly enrich himself by appropriating an asset of the employer for which the employee has not paid and using it against that very employer. If the employer is able to show a protectable interest under the rule just outlined, the covenant *in its entirety* is presumptively enforceable.

■ The employee then has his turn. He may rebut the presumptive enforceability of the covenant in one of two ways, depending on the nature of the interest shown by the employer. If the employer has shown that conversion of a trade asset by the employee will threaten his market share, the employee may in his rebuttal show that he has had no access to the asset in question and is consequently unable to convert it. In that event the covenant does not apply to him. The employee may also show that the asset in question really belongs to him, either because he brought it with him when he entered his employer's service [10] or because he "paid" for it during the term of his employment. In that event the covenant may be shaved to reflect a proper balance between the employee's and the employer's interests in the implicated asset. Finally, even where an asset be-

longing to the employer is susceptible of conversion, the employee may show, given the natural tendency of covenants not to compete towards overbreadth, that the enforcement of the covenant in its entirety will unnecessarily overprotect the employer because the covenant reflects a degree of protection greater than the implicated asset merits. After all, any protection afforded beyond that required by the employer's legitimate business interests creates a dead economic loss.

■ If, on the other hand, the employer has shown that the covenant protects his amortization of a non-ordinary investment in the employee, the employee's rebuttal is limited to a showing that the employer has had time to recoup his investment in the employee and the covenant, therefore, should expire. Where the covenant has already passed muster as a reasonable one, and operates purposely as a hardship in order to encourage the employee to remain with his employer until his investment is recouped, a court should review the extent of the covenant limitations only with the greatest of reluctance, and upon an extraordinary showing.[11]

Finally, it should be noted that perfect results may not be attainable, because effective remedies may be impossible to devise. The ideal remedy may be an injunction against solicitation of the employer's customers, and such relief has been grant-

---

**10.** "The purpose of enforcing covenants not to compete is to prevent the employee from stealing the employer's good will, not to enable the employer to steal the employee's good will. Each party is entitled to keep the good will and reputation he would have had if he had never made a contract with this particular litigant...."
*Corbin on Contracts*, § 1391B (Kaufman Supp. 1982).

**11.** We note that, in a case very similar to ours, but lacking the same overlay of public interest, a court has held a restrictive covenant invalid where it would require the physician to remove himself from the community in which he had made substantial investment, since there was a compelling need for the physician's service. To uphold the covenant, the court said, would be to jeopardize the public health. *Damsey v. Mankowitz*, 339 So.2d 282, (Fla.App.1976). To the extent that the hardship to the doctor deter-

mined the court's decision, we find the decision unsound.

Professor Corbin reminds us that "disproportionate hardship to the party against whom enforcement is sought has always been regarded as a reason for refusing equitable remedies." A.L. Corbin, *Contracts*, § 1394, at 101. However, in between the hardship of an inherently unreasonable covenant, from which an employee is protected by our threshold analysis, *supra*, and the normal hardship that is the purposeful result of an anticompetitive covenant, there is little room to find "disproportionate hardship."

As we discuss, *supra*, these covenants provide an incentive for an employee to stay at work for the employer. This incentive is the hardship of a move. As the Supreme Court of New Jersey has recently pointed out, "a mere showing of personal hardship does not amount to an 'undue hardship' that would prevent enforcement of the covenant." *Karlin v. Weinberg*, 77 N.J. 408, 417–418 n. 3, 390 A.2d 1161, 1166 n. 3 (1978).

ed by courts. *See Mills v. Murray,* 472 S.W.2d 6 (Mo.App.1971); *Rudolph Bros., Inc. v. Greulick, supra.* However, as Professor Blake points out, "it is difficult to think of a more easily frustrated order than an injunction against solicitation." *Blake, supra* at 656.

■ The approved procedure for reviewing a covenant not to compete, briefly summarized, thus involves three steps: (1) The court must determine that the covenant is reasonable, and is being used reasonably by the employer. If not, the covenant is set aside. If the covenant is inherently reasonable the inquiry continues. (2) The employer must show, under the circumstances, what legitimate interests of his are implicated. When these are established, the reasonable covenant is presumptively enforceable in its entirety. (3) The employee is then given the chance to rebut the presumptive enforceability of the covenant by showing either that he has no company trade assets to abuse, or that the assets made available to him properly belong to him, or that the interests asserted by the employer may be protected by a partial enforcement of the covenant. If the employee prevails in this latter regard then the covenant may be tailored by the court to comport with the equities of the case.

It is no doubt apparent to the reader at this point that we have not cleared up the swampy morass of conflicting interests and policies into which a court may eventually need to plunge to resolve the problems these covenants present. We have, however, offered a structure that will allow both courts and litigants to narrow the possible issues to be decided in these cases and, most importantly, we have established the order in which issues should be presented. Section VI *infra,* will deal in greater detail with both the order and burden of proof. While future, better minds will no doubt find room for improvement, we consider this at least a halting step in the right direction.

## VI

### APPLICATION OF THE ANALYSIS

The case before us presents exclusively the customer good will issue. There is no assertion that Dr. Reddy was made privy to any industry secrets or other confidential information, nor is it asserted that there will be any wrongful conversion by Dr. Reddy of any special skills acquired by him as a result of his employment by the Foundation. Within the context of the customer good will issue, however, this case is unusual in the extent to which public welfare is urged as the dominant issue.[12]

The crux of this particular case is the issue of damage to the employer, since the covenant is not unreasonable on its face. Other similar covenants have been enforced. *Canfield v. Spear,* 44 Ill.2d 49, 254 N.E.2d 433 (1969) (dermatologist; 3 years and 25-mile radius of city); *Lovelace Clinic v. Murphy,* 76 N.M. 645, 417 P.2d 450 (1966) (dermatologist; 3 years and county within which employer carries on his practice); *McMurray v. Bateman,* 221 Ga. 240, 144 S.E.2d 345 (1965) (3 years; within 50 miles of city); *Marshall v. Covington,* 81 Idaho 199, 339 P.2d 504 (1959) (physician; 3 years and 25 miles from city); *Mabray v. Williams,* 132 Colo. 523, 291 P.2d 677 (1955) (5 years; within 50 miles of city); *Andrews v. Cosgriff,* 175 Minn. 431, 221 N.W. 642 (1928) (physician; 5 years and 25 miles from city).

Furthermore, the briefs submitted by the appellee Foundation and by the Preston County Health Council [13] as *amicus curiae*

12. Commonly, when an ex-employee is enjoined from competing with his old employer, the public concern is the withdrawal of that employee's skills from the marketplace. Here, the Foundation argues, permitting Dr. Reddy to violate the covenant and practice medicine in the community of Man would work to the detriment of the community's medical services, since the existence of the Foundation is essential to the provision of quality medical care in the community, and Dr. Reddy's competition would threaten the Foundation's survival. We thus have the party against whom the policy is commonly asserted, namely the employer, asserting it itself in this case.

13. The Preston County Health Council is an organization comparable to the Community Health Foundation of Man, and performs a sim-

make arguments that compel the conclusion that the restrictive covenant has a higher purpose than merely to repress the employee and prevent him from leaving.

The Preston County Health Council and the Community Health Foundation of Man are nonprofit organizations that serve their communities by assuring that quality health care is available in their local areas.[14] Their theory, summarized briefly, is that they need to rely on the doctors they bring into the area continuing to work for them. Otherwise doctors would come to town, work for the clinic until they built a substantial practice, and then operate a private office, taking business away from the clinic. The Foundation argues that if doctors are permitted to "rob" the clinic of its patients, the Foundation will lose needed revenue and, since it relies on clinic charges to stay solvent, the clinic will no longer be able to assure quality health care for the people of Man.

The purpose of the restrictive covenant before us, then, is eleemosynary. With its eleemosynary purpose and accepted time and area restrictions, the covenant is conclusively reasonable on its face. We then proceed to the very complex issue of the extent to which the covenant is a fair protection of the Foundation's legitimate business interests against unfair competition, and here we founder for lack of evidence.

We note at the outset the obvious objection that the doctor and the Foundation are not in fact in competition. Dr. Reddy provides medical services in his professional capacity as a doctor. The Foundation does not. The Foundation's purpose is to see that quality health care is available in the Man area, and to that end it provides a protective financial umbrella over new practitioners, absorbing all start-up costs, providing all support services, and ensuring each new doctor attractive compensation. It does not, technically, provide medical services. In order to compete directly with the Foundation, Dr. Reddy would need to open a clinic that brings doctors to the area. Since Dr. Reddy plans to stay in Man, the argument goes, his interests are in harmony with the Foundation's; they both seek to assure that quality medical care is provided.

This argument would have some merit, *see,* for instance, *Karpinski v. Ingrasci,* 28 N.Y.2d 45, 320 N.Y.S.2d 1, 268 N.E.2d 751 (1971) (dentist not in competition with oral surgeon), but for the public welfare questions involved. The State has an important interest in the provision of good medical care to its citizens. To that end, it licenses doctors—the profession is regulated because defects of practitioners are hard to detect, and their consequences may be irremediable. The provision of medical services is an enterprise entirely overlaid with the public interest. If Dr. Reddy's violation of his covenant is inimical to that interest, we will not allow fine distinctions between the services provided by the doctor and those provided by the Foundation to permit him to violate his covenant.[15]

Similarly, the semantic distinction between an "employee" and an "independent contractor" should not be a controlling factor where the analysis we have endorsed of a restrictive covenant reveals a sound, legitimate, economic basis for enforcing the covenant.

To reiterate our earlier abstract analysis, at the heart of all enforceable covenants not to compete is the principle of avoiding unjust enrichment. In this regard, in order for a contract to be enforceable, it must be shown that the employee, if allowed to compete freely against the employer, will do so by appropriating the employer's own assets. In the case before us the employer

ilar service for Preston County to that which the Foundation provides for Logan County.

**14.** In this regard, we take judicial notice of the federal grants to the Foundation, and are willing to accept the grants as evidence of the merits of the Foundation's public purpose. We also take judicial notice that there is a very real health care problem in Southern West Virginia.

**15.** We are not the first court to find public health questions dispositive in a restrictive covenant dispute. *See Odess v. Taylor,* 282 Ala. 389, 211 So.2d 805, where the court refused to uphold a covenant because of a shortage of ear, nose and throat specialists in the restricted area. We may, however, be the first court to endorse upholding such a covenant on those grounds.

urges that its provision of equipment and supporting staff to Dr. Reddy made it possible for the doctor to engage in a medical practice in Man and gain the good will of sufficient patients to allow him to undertake his own practice without substantial financial risk.

Doctors who come to Man under the auspices of the Foundation are guaranteed a salary of $50,000 *per annum.* A doctor coming to a town on his own and opening a practice "pays for" that practice with the risks of his first few lean years. The Foundation's theory, in economic terms, is that doctors who are allowed to leave the clinic and then compete with it would have probably not "paid for" the customer good will that their work at the clinic provided them. Rather, they would have converted that asset to their own use after having in the interim enjoyed the benefits of building a practice in a risk-free environment where all costs of their acquiring patient good will are borne by others.

The covenant is thus a response to the unjust enrichment of doctors that would be the result of the Foundation's labors if the clinic were left unprotected.

Furthermore, the Foundation argues, the covenant protects the quality of the health care provided to Man area residents. Although it overlaps the first argument, this argument is distinct from it, and presents an extraordinary situation outside of the stock list of protectable interests—investment in training, trade secrets, and customer lists. Here the argument is that good quality health care can only be obtained through substantial economies of scale. If the majority of patients in the environs of Man do not use the Foundation's facilities, then the Foundation cannot support the capital equipment and paid specialists necessary to assure proper patient care. The Foundation argues essentially that it would be impossible to attract doctors if the salary were "discounted" to reflect the opportunity that the doctor has to establish the base for a private practice, and that even if such a pattern were practicable, it would ultimately destroy the clinic. Consequently, the clinic wants to pay the market rate

for doctors in order to attract the best available physicians; however, it wishes to protect itself from subsidizing its own demise. In this regard, the Foundation argues that private doctors would not ordinarily choose Man as a place to invest the initial capital necessary to begin a successful practice in competition with the Foundation if they were left to their own devices, and were not subsidized by the Foundation or some other employer.

Essentially, it is urged that the investment in supporting equipment and staff cannot be made economically if doctors can leave freely once their position with patients is secure. Underlying this position is the suggestion that doctors can provide inferior medical services at a lower price than the clinic—supporting as it does equipment, staff, and specialists—but that patients will be unaware of, and hurt by, the difference in quality that allows lower fees.

Whether, however, any of these arguments is supported by the economic facts of medical practice in Man is not disclosed by the record before us. Consequently, the case must be remanded for further proceedings to determine whether the facts support the argument.

The court below must ascertain the degree of protection the Foundation requires to vouchsafe its legitimate business interests, which in this case amount to no more than the public interest in quality health care. Evidence of the public interest at stake would include, although perhaps is not limited to, the dependence of the Foundation's clinic on economies of scale and market share protection in order to provide essential medical services that doctors working privately could not, or would not, provide. If the Foundation is able to provide specialists to the clinic who would, except for the existence of the Foundation and its clinic, never be available to local patients, that, in and of itself, amounts to a compelling reason to enforce the covenant. If the clinic is able to acquire expensive machinery, such as a CAT scanner, by virtue of the operation of the restrictive covenant and a resulting market concentration

that enhances economies of scale, that would amount to a compelling reason. Without further evidence, however, the crucial issue of the employer's legitimate interest in the enforcement of the covenant cannot be decided.

Once the Foundation has shown the extent of its legitimate business interests, and the need for protection of them, Dr. Reddy may rebut the presumptive enforceability of the covenant. He may, for example, demonstrate that both the time and distance provisions are unnecessarily broad and that less burdensome restraints would achieve the clinic's legitimate goals.

## VII

### THE BURDEN OF PROOF

While throughout this opinion we have alluded to the burden of proof, it is probably appropriate to explore the subject in greater detail and in the context of the facts as they relate to Dr. Reddy. Initially, as we have said, a court must conclude that the covenant is reasonable on its face and falls within the category of covenants not to compete that are enforceable. This is an issue of law for the court that can usually be decided by inspection of the contract alone. However, to the extent that the issue of reasonableness is not apparent from the four corners of the contract alone, the burden of demonstrating reasonableness is upon the employer. Secondly, the burden of proving the legitimate interests that a reasonable covenant is designed to protect falls on an employer asserting those interests. Once the employer has shown legitimate interests that require protection from the employee, the covenant becomes presumptively enforceable in its entirety. The burden then shifts to the employee to prove that the enforcement of the covenant in its entirety would result in a limitation of his freedom that is unnecessary to protect the legitimate interests of the employer, or that the employer possesses no assets appropriated from the employer.

██ We have found the restrictive covenant before us sufficiently reasonable that it is not invalid on its face. Certainly neither its time limitations nor geographical distance was designed as an *in terrorem* weapon against the ignorant or unprotected. The burden upon remand is now upon the Foundation to show, and not merely allege, the need for protection of a legitimate interest. Once that burden has been met, the covenant becomes presumptively enforceable in its entirety and the burden shifts to Dr. Reddy to demonstrate to the court why the time and distance provisions of the restrictive covenant are overly broad, and that they can be narrowed without jeopardizing any legitimate interest of the Foundation.

Accordingly, for the reasons set forth above, the judgment of the Circuit Court of Logan County is reversed, and the case is remanded for further proceedings consistent with this opinion.

Reversed and remanded.