# United States Court of Appeals
### For the Eighth Circuit

_____

No. 16-3113

_____

Ag Spectrum Company

*Plaintiff - Appellant*

v.

Vaughn Elder

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Southern District of Iowa - Davenport

_____

Submitted: April 6, 2017
Filed: August 2, 2017 **(Corrected 8/3/2017)**

_____

Before SMITH, Chief Judge, SHEPHERD, Circuit Judge, and FENNER,[1] District
Judge.

_____

SMITH, Chief Judge.

After leaving its employ, Vaughn Elder contracted with Ag Spectrum Company
("Ag Spectrum") to provide services as an area manager. The arrangement was

---

[1]The Honorable Gary A. Fenner, United States District Judge for the Western
District of Missouri, sitting by designation.

formalized through an independent-contractor agreement ("Agreement"). The Agreement prohibits Elder from competing with Ag Spectrum for three years if either party ends the relationship. Because Elder developed his own customer base and received only minimal support from Ag Spectrum, we agree with the district court[2] that the Agreement's noncompete provision is unreasonable and therefore unenforceable. Accordingly, we affirm.

## I. *Background*

In 2000, Elder became a sales representative for Ag Spectrum, an Iowa business selling fertilizer, nutrients, and crop-management services. In 2005, Elder stopped working as an Ag Spectrum employee and became an Ag Spectrum "Area Manager." He formalized this relationship with the Agreement in which he agreed to sell only Ag Spectrum product in exchange for a 1 percent loyalty payment every five years.

The Agreement described Elder's status vis-a-vis Ag Spectrum. He had to supply, at his "sole expense," all the materials needed for his work. He was not an employee for tax purposes. He was to be "engaged in [his] own independent business" and thus was prohibited from participating in any Ag Spectrum employee benefit plan. He was not covered by an Ag Spectrum workers' compensation policy. And he had no authority to contract on Ag Spectrum's behalf. Elder also agreed not to compete with Ag Spectrum by marketing to, selling to, or consulting with its customers about similar products for three years after terminating the Agreement.

Elder served a customer base in Kansas, Colorado, and Nebraska. He sold Ag Spectrum product directly through his own efforts and indirectly through dealers working under him. He testified that "virtually all" of his sales were to people he had

---

[2]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

"developed relationships with over the course of [his] life" or to his dealers. Only two of Elder's customers came to him through Ag Spectrum.

Elder also handled the Ag Spectrum product as he saw fit. He ordered, unloaded, managed, and paid for it. Elder stored the product at his own warehouse and at a railroad tank facility provided by Ag Spectrum (though operated by Elder). When a customer or dealer ordered product from Elder, it was delivered from the warehouse, the railroad tank facility, or from manufacturers or other storage facilities in other states. None of the out-of-state facilities was owned by Ag Spectrum. Every week Elder filled out an "inventory transfer sheet" to reflect the product he had sold that week. He then had to pay Ag Spectrum for it within 10–14 days. If Elder's customers did not pay, then the loss fell on Elder, not Ag Spectrum.

True to the agreement, Elder never got a paycheck or any employment benefits from Ag Spectrum. He bought his own commercial and auto insurance. He used his own equipment and maintained it himself. His profit was the difference between what he paid Ag Spectrum and what he sold the product for (minus any commissions that he owed his dealers). He paid Ag Spectrum through his own line of credit at a local bank. Elder did, though, receive a yearly award of $1,500 from Ag Spectrum when he sold more than $1 million in product.

Ag Spectrum, for its part, contends that Elder got more than just product to sell. Elder had access to the company's research-backed crop-management tools, including "management zone" mapping for each customer's farm. (Elder responds that "as a matter of habit [he] did not follow Ag Spectrum's recommendations" because they were "mostly irrelevant and incorrect." He says that he did not use the "management zone" mapping because Ag Spectrum would have charged him for it.) Ag Spectrum also trained Elder and his dealers on Ag Spectrum product and provided marketing, accounting, and distribution help. The company provided Elder with the railroad tank

-3-

facility and with leased railcars to haul product to it, though Elder paid the freight and maintained the facility.

Elder terminated the Agreement in September 2012 and soon began competing with Ag Spectrum. In January 2015, with roughly nine months left in the noncompete term, Ag Spectrum sued Elder for breaching the noncompete provision. Elder moved for summary judgment, contending that the provision was unenforceable under Iowa law. Ag Spectrum cross-moved for partial summary judgment on Elder's breach. The district court granted Elder's motion and denied Ag Spectrum's, concluding that as a matter of law the provision was unreasonable and therefore unenforceable. Ag Spectrum appeals.

## II. *Discussion*
### 1. *What is the Standard for Enforcing Noncompetition Provisions?*

We review the district court's summary judgment ruling de novo. *Jackson v. Riebold*, 815 F.3d 1114, 1119 (8th Cir. 2016). The parties agree that Iowa law governs this dispute. Iowa courts enforce noncompete provisions only when the provision is reasonably necessary to protect the employer's business and does not unreasonably restrict the employee's rights or harm the public interest. *Iowa Glass Depot, Inc. v. Jindrich*, 338 N.W.2d 376, 381 (Iowa 1983). "Essentially, these rules require us to apply a reasonableness standard in maintaining a proper balance between the interests of the employer and the employee." *Id.*

The employer seeking to restrain competition bears the burden of proving reasonableness, which rarely comes down to a single fact and always depends on the particular circumstances. *Id.* at 381–82. Several factors go into reasonableness, including: (1) the employee's closeness to customers; (2) the employees's "peculiar knowledge gained through employment that provides a means to pirate the customer"; (3) the amount and sophistication of employer-provided training and the nature of the business; and (4) "matters of basic fairness." *Id.* at 382; *see also Revere Transducers,*

*Inc. v. Deere & Co.*, 595 N.W.2d 751, 761 (Iowa 1999). At bottom, the goal is preventing unjust enrichment. *See Iowa Glass*, 338 N.W.2d at 382 (asking whether former employee could "unjustly enrich himself at the expense of his former employer"); *Reddy v. Cmty. Health Found. of Man*, 298 S.E.2d 906, 919 (W. Va. 1982) ("[A]t the heart of all enforceable covenants not to compete is the principle of avoiding unjust enrichment.").

### 2. *Who Determines Enforceability?*

A major point of conflict in this appeal is who decides reasonableness—the court or the jury? Ag Spectrum argues that the district court erred by resolving disputed material facts regarding the provision's reasonableness. *See* Fed. R. Civ. P. 56(a). According to Ag Spectrum, a jury should decide reasonableness. The Iowa Supreme Court has not said whether the enforceability of a noncompete provision is a question for the court or for the jury. Ag Spectrum acknowledges that in some states it is a question for the court. But the company argues that because enforceability depends on reasonableness, it is quintessentially a fact issue for the jury.

Without controlling precedent from the Iowa Supreme Court, we must predict how that court would answer this question. *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 856 (8th Cir. 2010). For two reasons, we think that the Iowa Supreme Court would hold that the enforceability of a noncompete provision is a question for the court. First, Iowa has held that a similar issue—whether a liquidated-damages provision is an unenforceable penalty—"is a question of law for the court." *City of Davenport v. Shewry Corp.*, 674 N.W.2d 79, 85 (Iowa 2004) (quoting *Rohlin Constr. Co. v. City of Hinton*, 476 N.W.2d 78, 79 (Iowa 1991)). The enforceability of a liquidated-damages provision, like the enforceability of a noncompete provision, is a public-policy question based on reasonableness. *See Rohlin Constr.*, 476 N.W.2d at 80 ("A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy . . . ." (quoting Restatement (Second) of Contracts § 356(1)

(1981))); *see also Iowa Glass*, 338 N.W.2d at 381 (rules on noncompete provisions "require [courts] to apply a reasonableness standard").

Second, although reasonableness is fact dependent, courts have generally held that the ultimate question of enforceability is one of law rather than fact.[3] It is true, as Ag Spectrum notes, there is authority to the contrary.[4] The majority of courts, however, leave enforceability of noncompete clauses to courts, not juries.[5] Facts are crucial to the enforceability analysis, but we think that the Iowa Supreme Court would

---

[3] *See, e.g.*, *Baxter Int'l, Inc. v. Morris*, 976 F.2d 1189, 1197 (8th Cir. 1992) (Illinois law); *Cent. Ind. Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 729 (Ind. 2008); *Omniplex World Servs. Corp. v. US Investigations Servs., Inc.*, 618 S.E.2d 340, 342 (Va. 2005); *Weber v. Tillman*, 913 P.2d 84, 89 (Kan. 1996); *Bicycle Transit Auth., Inc. v. Bell*, 333 S.E.2d 299, 304 (N.C. 1985); *Orkin Exterminating Co. v. Pelfrey*, 227 S.E.2d 251, 252 (Ga. 1976); *Loewen Grp. Acquisition Corp. v. Matthews*, 12 P.3d 977, 980 (Okla. Ct. App. 2000).

[4] *See Rollins Burdick Hunter of Wis., Inc. v. Hamilton*, 304 N.W.2d 752, 757 (Wis. 1981) (record too weak to determine reasonableness "as a matter of law, one way or the other"); *Whitby v. Infinity Radio Inc.*, 951 So. 2d 890, 897 (Fla. Dist. Ct. App. 2007) (reasonableness is a "question of fact for the trial court").

[5] *See* 6 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 13:4 (4th ed. 2009) ("The question of reasonableness [of a noncompete provision] is ordinarily for the court, not the jury."); *id.* at § 13:5 ("[T]he question of the reasonableness of [restrictions on doing business] is a matter of law for the court to decide . . . ."); 15 Grace McLane Giesel, Corbin on Contracts § 80.6 (Joseph M. Perillo ed., rev. ed. 2003) ("As with other questions of public policy, the question of reasonableness is one for the court."). *But see* Williston & Lord at § 13:4 (also noting, without citation, that "there are at times mixed questions of law and fact concerning what is a reasonable restraint"); *id.* § 13:5 (noting that reasonableness in the particular circumstances "is essentially an inquiry of fact and not a naked matter of law" (quoting *Charles S. Wood & Co. v. Kane*, 125 A.2d 872, 875 (N.J. Super. Ct. App. Div. 1956))). On a different issue of noncompete law, the Iowa Supreme Court has in the past adopted the position of Williston and Corbin. *Ehlers v. Iowa Warehouse Co.*, 188 N.W.2d 368, 370–72 (Iowa 1971).

recognize the ultimate question to be for the court. *See* Frank Harty & Ryan Stefani, *Drafting and Enforcing Non-Compete Clauses in Iowa: A Thirty-Year Review*, 64 Drake L. Rev. 325, 338 (2016) ("[T]he law of Iowa has developed in the same manner as that of the majority of jurisdictions.").

### 3. *Is This Noncompetition Provision Enforceable?*

We now consider whether the district court correctly determined that the provision here is unenforceable. Like the district court, we decline Elder's invitation to hold that noncompete provisions binding independent contractors are per se unenforceable. Instead, balancing the benefits and burdens under the traditional reasonableness test, we conclude that Ag Spectrum's noncompete provision is unreasonable and therefore unenforceable.

First, the provision is not reasonably necessary to protect Ag Spectrum's business. The company contends that the provision's purpose was "to protect Ag Spectrum's business interest in the information and training provided to Elder and Ag Spectrum customers and to sustain customer goodwill and demand for its product." Ag Spectrum has not shown that the training and information provided to Elder enabled him to unfairly compete against Ag Spectrum. Essentially, Elder bought Ag Spectrum product and sold it at a markup. In this context, Ag Spectrum's support resembles the type of support that any reseller would expect to receive. Thus, like ordinary on-the-job training, Ag Spectrum's training and support is not entitled to special protection. *See Iowa Glass*, 338 N.W.2d at 382. Nor did Elder's knowledge of Ag Spectrum's product pricing give him an advantage when he left his arrangement with Ag Spectrum.

Ag Spectrum also contends that Elder benefitted from the company's goodwill and customer base. We disagree. Elder was the company's "nearly exclusive contact" with customers in his area. But this evidence also reflects that many purchasers bought Ag Spectrum product because they were Elder's customers rather than Ag Spectrum's.

In other words, Elder connected his customers to Ag Spectrum—not the other way around. Elder's being an independent contractor favors his independence in conducting his business and suggests that Elder's customers did not belong to Ag Spectrum. "[T]he more the relationship between employer and employee looks like an agent-principal or independent contractor relationship, the more the customer list becomes an asset properly belonging to the employee . . . ." *Reddy*, 298 S.E.2d at 912. Elder was not an employee servicing customers provided by the company. *See Orkin Exterminating Co. v. Burnett*, 146 N.W.2d 320, 324 (Iowa 1966). He was an independent contractor making his own contacts. In this situation, the noncompete provision allows Ag Spectrum not to protect a proprietary customer base, but rather to capture customers that someone else provided. *See Iowa Glass*, 338 N.W.2d at 382 (refusing to enforce a noncompete provision in part because employee "received little specialized training and there were no trade secrets or exclusive customer lists which he could purloin").

Second, the provision burdens Elder out of proportion to Ag Spectrum's benefit. As the district court noted, enforcing the provision would effectively require Elder "to build a customer base from scratch." This is especially problematic given that Elder's customer base with Ag Spectrum was built on connections made through his dealers or through people "with whom [Elder] had developed relationships with over the course of [his] life." Ag Spectrum suggests that Elder could still sell noncompeting products to these same customers or sell competing products to new customers. Still, requiring Elder to perform these workarounds is an unreasonable burden given how little protectable benefit Ag Spectrum has in the parties' independent-contractor relationship. *See id.* at 381 ("[T]he covenant must not . . . create hardships on the employee out of proportion to the benefits the employer may be expected to gain.").

-8-

Third, as the district court noted, there is no evidence that restricting Elder's business would harm the public. The public interest factor does not strongly support either side.

Because requiring Elder to forsake the customers that he brought to Ag Spectrum as an independent contractor is unreasonable in the circumstances, we hold that the noncompete provision demanding this result is unenforceable. Elder's business activity fosters fair competition in the marketplace, not unjust enrichment.

## III. *Conclusion*

Accordingly, we affirm the district court's judgment.

_____