**Todd N. SHANKS, Plaintiff,**

v.

**BLUE CROSS AND BLUE SHIELD UNITED OF WISCONSIN, Defendant.**

No. 91–C–40.

United States District Court, E.D. Wisconsin.

Nov. 22, 1991.

Gray & End by J. Michael End, Milwaukee, Wis., for plaintiff.

Kim M. Cafaro and Elizabeth Bartlett, Milwaukee, Wis., for defendant.

## DECISION and ORDER

MYRON L. GORDON, Senior District Judge.

This action was originally filed in Wisconsin circuit court. In the original complaint, plaintiff Todd Shanks asserted that defendant Blue Cross & Blue Shield United of Wisconsin ("Blue Cross"), administrator of a group health benefit plan in which he was a participant, had in bad faith refused to pay his health benefits claim. On January 9, 1991, the defendant removed the action to this court, pursuant to 28 U.S.C. § 1441, asserting the existence of a federal question and federal pre-emption under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. The plaintiff subsequently amended his complaint (with consent of the defendant) to reflect that the action is one seeking payment of health benefits from an ERISA plan under § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

The action was tried to the court on September 5, 1991. The court has reviewed the evidence and now makes its findings of fact, *see* Rule 52(a), Federal Rules of Civil Procedure, and conclusions of law. Based on these findings and conclusions, the court will direct the entry of judgment for defendant Blue Cross.

### I.

For three days beginning on July 28, 1989, the plaintiff was hospitalized at Sinai Samaritan Medical Center for a chronic back condition; on September 20, 1989, he underwent back fusion surgery at Sinai Samaritan Medical Center. He incurred medical expenses of $16,698.39 in connection with his hospitalization and surgery. He was then a member of a group health benefit plan issued and administrated by defendant Blue Cross to plan provider Aurora Health Care, Inc. The terms of the plan (an "ERISA plan" under 29 U.S.C. § 1102) were governed by a twenty-two page contract, which was supplemented with an eighty-two page group provider plan. These documents, which will be referred to collectively as the "plan contract," set forth, among other things, the eligibility requirements for health benefits under the ERISA plan. Defendant's Exhibit 1 (hereafter referred to as "DX 1"). When defendant Blue Cross refused to pay the plaintiff any health benefits relating to his hospitalization and surgery, the defendant commenced this action.

For purposes of this action, the parties do not dispute that the "effective date" of the plaintiff's plan contract with defendant Blue Cross was June 1, 1989. Nor do the parties dispute that prior to June 1, 1989, the plaintiff was afflicted with a "pre-existing" back condition.

### A.

At trial, the plaintiff testified that on June 8, 1988, he visited the office of Dr.

Thomas J. Flatley. The plaintiff's testimony established that Dr. Flatley performed the following services during the office visit: a physical examination of the plaintiff and x-rays of the plaintiff's back. Tr. at 25. The plaintiff's testimony also demonstrated that after conducting these tests and examinations, Dr. Flatley made a preliminary diagnosis of possible degenerative disc disease. Tr. at 25.

The plaintiff testified that he believed Dr. Flatley to be "a back specialist." Tr. at 32. However, he also testified that he was not suffering any back pain when he visited Dr. Flatley. Tr. at 26–27, 29–30. (Dr. Flatley's office notes, which were received into evidence without objection, listed the plaintiff's "C.C."—chief complaint— as "back pain," *see* DX 4.) Although the plaintiff asserted that Dr. Flatley did not tell him how to "treat" his back *pain* with exercise, he testified that the doctor had "counseled" him in the care of his back. Tr. at 31. The plaintiff's testimony established that Dr. Flatley provided him with "basic advice on things to avoid irritation of your back. . . ." Tr. at 25. The plaintiff testified that Dr. Flatley provided him with a book of exercises for keeping his back "in shape" and "general information" relating to the care of his back condition. Tr. at 31–32.

Dr. Flatley did not appear in person to testify at trial. However, his deposition testimony, portions of which were read into the trial record, revealed that the doctor is, in fact, a back specialist, who operates on approximately 150 back patients a year. Tr. at 33–34. Dr. Flatley's testimony also confirmed that he had diagnosed the plaintiff with possible early degenerative disc disease during the June 8, 1988, office visit. Tr. at 34. His testimony further established that after his examination of the plaintiff's back, he advised the plaintiff to undertake a regimen of exercise and general back care. *See* Tr. at 37–38. Dr. Flatley testified that he had told the plaintiff to watch his "bending and lifting and pushing and pulling"; to avoid sitting, standing, or walking for "too long a time"; to watch his weight; and to sleep on his side. Tr. at 39. He also acknowledged that there were dif-

ferent levels of back treatment ranging from conservative to aggressive. Tr. at 41. Dr. Flatley's office notes disclosed that the plaintiff had previously been treated with medication for pain stemming from his back condition. *See* DX 4; *see also* Tr. at 30.

**B.**

As a plan member, the plaintiff was bound by the terms of the plan contract, including all eligibility requirements. Two sections of the plan contract are implicated under ERISA by the plaintiff's claim for benefits.

Section WP of the plan contract defined the "waiting period" for benefits. This "waiting period provision"—an exclusion of benefits that would otherwise have been available under the plan contract—stated as follows

Except as otherwise specified in Section—DM [addressing disabled member eligibility], if a MEMBER receives MEDICAL CARE or treatment for any illness during the twelve (12) months immediately preceding the EFFECTIVE DATE, benefits for such PRE–EXISTING CONDITION shall not be available until the earliest of:

1. the end of a period of ninety (90) consecutive days after the EFFECTIVE DATE during which the MEMBER has not received MEDICAL CARE or treatment for such PRE–EXISTING CONDITION; or

2. the end of a period of two hundred seventy (270) consecutive days during which such person has been a MEMBER under this CONTRACT and any other PLAN contract in effect immediately prior to the EFFECTIVE DATE.

DX at 58 (capitalization in original).

In the definitions section of the plan contract, the term "medical care" was defined as follows

MEDICAL CARE (MEDICAL SERVICES)—professional services rendered by a PHYSICIAN or a PROFESSIONAL OTHER PROVIDER for the treatment

of an ILLNESS or injury by other than surgical methods.

DX 1 at 6 (capitalization in original).

## II.

To prevail in his claim under § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), the plaintiff must demonstrate that "benefits [are] due him under the terms of his plan."

 The parties have manifested their agreement that the plan contract is an "insurance contract." The parties have also agreed that it is Wisconsin contract law that governs this issue. *See Schulist v. Blue Cross & Blue Shield of Iowa,* 717 F.2d 1127, 1135 (7th Cir.1983) (ERISA benefits contract interpreted under state contract law). Under Wisconsin law, the interpretation of an insurance contract poses only a question of law. *Just v. Land Reclamation, Ltd.,* 155 Wis.2d 737, 744, 456 N.W.2d 570 (1990); *Kraemer Brothers, Inc. v. United States Fire Insurance Co.,* 89 Wis.2d 555, 561, 278 N.W.2d 857 (1979). "Ambiguities in coverage are to be construed in favor of coverage, while exclusions are narrowly construed against insurer." *Wood v. American Family Mutual Insurance Co.,* 148 Wis.2d 639, 652, 436 N.W.2d 594 (1989); *Kaun v. Industrial Fire & Casualty Co.,* 148 Wis.2d 662, 669, 436 N.W.2d 321 (1989). Nevertheless, the court is to accord the language of the insurance contract "the common and ordinary meaning it would have in the mind of a lay person." *Kremers–Urban Co. v. American Employers Insurance Co.,* 119 Wis.2d 722, 735, 351 N.W.2d 156 (1984).

The plaintiff claims that defendant Blue Cross unlawfully withheld payment for benefits that were "covered" by his ERISA plan contract with them. He claims that defendant Blue Cross wrongfully relied upon the waiting period exclusion, because he did not receive "medical care or treatment" within twelve months of the effective date of his plan contract, which would have triggered the waiting period. In addition, he claims that the term "medical care or treatment," as used in the waiting period exclusion of the plan contract, is ambiguous and must be construed in his favor as a matter of law.

### A.

 Whether an ambiguity exists in an insurance contract is itself a question of law. *Kremers–Urban Co.,* 119 Wis.2d at 735, 351 N.W.2d 156. A provision of an insurance contract is "ambiguous" if that provision is "reasonably and fairly susceptible to more than one construction." *Kremers–Urban Co.,* 119 Wis.2d at 735, 351 N.W.2d 156; *Jones v. Jenkins,* 88 Wis.2d 712, 722, 277 N.W.2d 815 (1979); *Garriguenc v. Love,* 67 Wis.2d 130, 135, 226 N.W.2d 414 (1975); *Sipple v. Zimmerman,* 39 Wis.2d 481, 496, 159 N.W.2d 706 (1968).

 When the terms of the insurance contract are "plain on their face," the contract "should not be rewritten by construction to bind the insurer to a risk that it was unwilling to cover, and for which it was not paid." *Garriguenc,* 67 Wis.2d at 135, 226 N.W.2d 414. Nevertheless, the test of the words of the contract "is not what the insurer intended the words to mean but what a reasonable person in the position of an insured would have understood the words to mean." *Kremers–Urban Co.,* 119 Wis.2d at 735, 351 N.W.2d 156; *Garriguenc,* 67 Wis.2d at 134–35, 226 N.W.2d 414; *McPhee v. American Motorists Insurance Co.,* 57 Wis.2d 669, 205 N.W.2d 152 (1973). Accordingly, the court should attempt to conduct its analysis of the waiting period provision from the perspective of a reasonable person in the position of the plaintiff.

The waiting period provision employs the combination of terms "medical care or treatment"—in the disjunctive. The plan contract includes its own definition of "medical care"; the definition is simple and declarative. The term is defined as "professional services rendered by a physician ... for the treatment of an illness or injury by other than surgical methods." *See* DX 1. The operative element of the definition is "professional services"—a term of broad scope. A reasonable person in the position of the plaintiff would certainly have understood the term to mean "services" rendered

by a medical professional—such as a medical doctor. Nevertheless, the plan contract's definition of "medical care," in turn (and perhaps inartfully), includes the term "treatment."

The plaintiff has cited an impressive array of judicial decisions from other jurisdictions that purport to define "treatment" favorably to him or that have deemed the term ambiguous. As if to concede the ambiguity of the term, defendant Blue Cross has cited an equally impressive array of other authorities, including conflicting decisions of other jurisdictions. Wisconsin law, however, does not provide a controlling definition in this context. *But see Robinson v. Mount Sinai Medical Center*, 137 Wis.2d 1, 402 N.W.2d 711 (1987) (viewing misdiagnosis as "negligent treatment" in a medical malpractice action); Wis.Stat. § 46.56(1)(p) (defining "treatment" as it relates to services for disabled children).

▇ It is true that under Wisconsin law, "where contract terms may be taken in two senses, evidence of practical construction by the parties is highly probative of the intended meaning of those terms and the court will normally adopt that interpretation of the contract which the parties themselves have adopted." *Zweck v. DP Way Corp.*, 70 Wis.2d 426, 435, 234 N.W.2d 921 (1975). Perhaps it was for this reason that both parties sought to extract a favorable definition of the term "treatment" from Dr. Flatley.

For example, when questioned by the plaintiff, Dr. Flatley said that he had "advised" but not "treated" the plaintiff:

> [MR. END (plaintiff's counsel)]: Would it be fair to say, Doctor, as of June 8th, 1988, you did not feel that treatment of the back problems complained of by Todd Shanks was necessary?
>
> [DR. FLATLEY]: That's correct.
>
> \*　\*　\*　\*　\*　\*
>
> [MR. END]: And as a result of that, you did not provide treatment for those complaints, did you?

> [DR. FLATLEY]: We advised him....
>
> Tr. at 35–36 (ellipsis in original).

However, when questioned by the defendant, Dr. Flatley testified that he had accorded the plaintiff at least "conservative treatment:"

> [MS. CAFARO (defendant's counsel)]: And on the second page of [Dr. Flatley's procedure notes from the day of the plaintiff's surgery, *see* DX 9] it reads degenerative disc disease L5–S1 history and exam: No change since office visit 8/18/89\*. See copy of office chart. Back pain has not been relieved by conservative treatment. Is that correct?
>
> [DR. FLATLEY]: That's correct.
>
> [MS. CAFARO]: Could you please tell me what you mean by conservative treatment?
>
> [DR. FLATLEY]: Well what we've been talking about for the last hour. I'm serious. It's what we've been talking about. Non-operative treatment.
>
> [MS. CAFARO]: All right. Such as telling him not to bend over, pick up things, is that correct?
>
> [DR. FLATLEY]: Yes, ma'am.
>
> Tr. at 37–38.

The court is constrained to conclude that recourse either to conflicting judicial decisions or to Dr. Flatley's reluctant testimony will not resolve the issue before the court. A most salient feature of Dr. Flatley's testimony on this matter was his stated awareness that the definition of the term "treatment" was in dispute; he had *no intention of entering the dispute.* He called the matter a "bag of worms." *See* Tr. at 43 (Dr. Flatley states: "I'm not going to get into the argument of whether telling [the plaintiff] not to bend or lift is treatment.") Moreover, in citing conflicting judicial decisions, the parties have not purported to apply the requirement, under *Wisconsin* law, that the court must ascertain how a *lay person* would interpret the term "treatment." Dr. Flatley is certainly not a "lay person" whose perspectives on the contract language would be relevant.

The court is of the opinion that "treatment," in its ordinary usage, is a term of very broad, general, and comprehensive

scope. A reasonable person would recognize the broad scope of the term "treatment." Moreover, an insurer does not create an ambiguous contract provision simply by employing terms of "broad, general and comprehensive scope." *See Garriguenc,* 67 Wis.2d at 137, 226 N.W.2d 414 (noting that the disputed terms were "very broad, general, and comprehensive" and resolving the dispute by examining what the terms were "ordinarily understood to mean").

█ "Treatment" is ordinarily understood to mean "to care for or deal with medically or surgically," *see Webster's Ninth New Collegiate Dictionary* at 1257 (1990) (definition of "treat"); *Random House Webster's College Dictionary* at 1421 (1991) (same); *American Heritage Dictionary of English Language* at 1367 (1981) ("treatment" is "[t]he application of remedies with the object of effecting a cure; therapy"); *see also Kremers–Urban Co.,* 119 Wis.2d at 741, 351 N.W.2d 156 (court employs dictionary to ascertain ordinary and common meaning of term contained in an insurance contract). A reasonable person in the position of the insured (the plaintiff) would have understood the word "treatment" to mean just that.

Granted, there are many "treatments" that a medical professional may accord a person who is under his or her care. The nature of the condition, the availability of alternatives, and the opinion of the attending medical professional dictate the precise nature of the "treatment" accorded. Alternative "treatments" considered in the medical professional's exercise of judgment may be to advise a person to rest or do nothing or to prescribe some sort of medication or therapy. However, neither the flexible nature of the interaction between a particular person and his or her attending medical professional, nor the fact that the medical professional may select one "treatment" alternative over another at a given point in time renders the term ambiguous.

I find that the term "treatment," although broad and general, is not reasonably and fairly susceptible to more than one construction. A reasonable person would agree that one who has been "dealt with" in a professional sense—advised or medicated—by a medical doctor has been "treated." Accordingly, I conclude that the combination of terms "medical care or treatment," as employed in the waiting period provision, is not ambiguous.

### B.

█ Where there is no ambiguity in the terms of the insurance contract, the court will "merely apply" the terms of the contract. *Kremers–Urban Co.,* 119 Wis.2d at 736, 351 N.W.2d 156; *Rabinovitz v. Travelers Insurance Co.,* 11 Wis.2d 545, 549–50, 105 N.W.2d 807 (1960). Moreover, the insurance contract "is to be considered as a whole in order to give each of its provisions the meaning intended by the parties." *Kraemer Brothers, Inc.,* 89 Wis.2d at 562, 278 N.W.2d 857; *see also Kremers–Urban Co.,* 119 Wis.2d at 738, 351 N.W.2d 156.

Although the waiting period provision may be considered an "exclusion," the plan contract is not ambiguous. Therefore, the combination of terms "medical care or treatment" must be given the "plain meaning" intended under the plan contract and not bluntly interpreted against defendant Blue Cross. The plaintiff's entitlement to benefits from defendant Blue Cross turns on whether his office visit with Dr. Flatley on June 8, 1988 (within twelve months of the "effective date" of his plan contract), constituted "medical care or treatment" under the waiting period exclusion of the plan contract.

█ The receipt of either "medical care" or of "treatment" activates the waiting period provision. As noted, medical care was specifically defined in the plan contract as "professional services rendered by a physician ... for the treatment of an illness or injury by other than surgical methods." *See* DX 1. "Treatment," as noted, occurs when one is "dealt with" in a professional sense by a medical professional; the object is remedial or therapeutic. In its ordinary usage, the term is associated with the cure or alleviation of an injury or illness. It may be that a mere "diagnosis" is not "treatment." However, the

plaintiff's testimony at trial demonstrated that Dr. Flatley examined his back condition, performed a diagnosis, *and* prescribed a regimen of back care at the June 8, 1988, office visit. There is no question that Dr. Flatley advised the plaintiff to follow some general instructions relating to the care of his back condition. There is no question that Dr. Flatley's advice was remedial—directed at least temporarily to the cure or alleviation of the plaintiff's back condition. There is no dispute that Dr. Flatley told the plaintiff how to bend, push, pull, sit, walk and sleep to minimize pain and discomfort. *See* Tr. at 39.

Even if the term "treatment" is given a narrow construction, the court is satisfied that a reasonable person in the position of the plaintiff would believe himself to have been "treated" by Dr. Flatley during the office visit. That other more rigorous "treatments" might have been available but, in Dr. Flatley's medical opinion, were not called for under the circumstances is of no moment. The evidence has unequivocally established that the plaintiff was the recipient of "medical care"—"professional services rendered by a physician ... for the treatment of an illness or injury by other than surgical methods"—"or treatment" from Dr. Flatley on June 8, 1988.

Because the injury was a "pre-existing condition" and he received "medical care or treatment" from Dr. Flatley within twelve months of the June 1, 1989, "effective date" of his plan contract, the plaintiff was obligated to abide by the terms of the "waiting period." Under the terms of the "waiting period provision," benefits relating to the plaintiff's "pre-existing condition" were not available to the plaintiff until the end of a period of 90 consecutive days *after* the effective date during which the plaintiff had not received "medical care or treatment" for his pre-existing back condition. *See* DX 1. Thus, to become eligible for health benefits relating to his pre-existing condition under the plan contract, pursuant to the waiting period provision, the plaintiff was obligated to delay any "medical care or treatment" relating to his back condition until August 29, 1989—90 days after the "effective date."

However, the plaintiff was hospitalized for medical care and treatment at Sinai Samaritan Hospital from July 28–August 1, 1989—only 58 days after the "effective date." In addition, the plaintiff underwent back fusion surgery at Sinai Samaritan Hospital on September 20, 1989, which surgery was within 51 days of his prior hospitalization at Sinai Samaritan Hospital—and within 90 consecutive days during which he had received medical care or treatment.

The plaintiff's course of conduct was inconsistent with his obligations under the waiting period provision of the plan contract.

### C.

The plaintiff has failed to establish that he was entitled to medical benefits from defendant Blue Cross under the plan contract and § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B). The terms "medical care or treatment" as used in the plan contract are not ambiguous—fairly and reasonably susceptible to more than one meaning—in any material sense. The plaintiff was ineligible for benefits under the waiting period provision of the ERISA plan contract; accordingly, defendant Blue Cross lawfully denied the plaintiff's benefits claim.

Because the plaintiff did not fulfill the conditions of the waiting period provision of the ERISA plan contract, defendant Blue Cross was not obligated to provide any health benefits to the plaintiff relating to his 1989 hospitalization and back fusion surgery. To award the plaintiff benefits would be to rewrite the plan contract by construction to bind defendant Blue Cross to "a risk that it was unwilling to cover, and for which it was not paid," *see Garriguenc*, 67 Wis.2d at 135, 226 N.W.2d 414.

### ORDER

Therefore, IT IS ORDERED that the plaintiff's action be and hereby is dismissed, with prejudice.

IT IS ALSO ORDERED that the clerk of court be and hereby is directed to enter a

judgment dismissing the action, with prejudice.