Christopher J. **HEDER**, Plaintiff,

v.

**CITY OF TWO RIVERS**, Defendant.

No. 00–C–0274.

United States District Court,
E.D. Wisconsin.

June 12, 2001.

Steven R. Olson, Manitowoc, WI, for plaintiff.

Everett E. Wood, Milwaukee, WI, for defendant.

### DECISION AND ORDER

ADELMAN, District Judge.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Christopher Heder worked as a firefighter for defendant City of Two Rivers, and worked overtime hours to receive paramedic training that defendant required. Plaintiff asserts that defendant paid him less overtime than required by the Fair Labor Standards Act (FLSA), 29 U.S.C. § 207(k), and recouped training expenses from his final wages pursuant to a training repayment agreement but in violation of Wis. Stat. § 109.03. Defendant counter-claims for remaining training expenses. Suit was initially filed in Manitowoc County Circuit Court, and removed to this court based upon federal question jurisdiction. Federal law governs the FLSA claims, and Wisconsin law governs all other claims. Defendant now moves for summary judgment and plaintiff counter-moves for partial summary judgment on the issue of liability.

Plaintiff was employed by defendant from January 24, 1994 until August 13, 1999, when he resigned and went to work as a firefighter for another city. Between February and August 1997, all City of Two Rivers firefighters, including plaintiff, received mandatory paramedic training. In addition, plaintiff received refresher paramedic training in February and May 1999. The parties' first dispute is what overtime pay plaintiff was entitled to receive for this training under the FLSA.

The second dispute is whether plaintiff is contractually obliged to reimburse defendant for costs associated with his paramedic training. On its face, a memorandum of agreement (MOA) created a training repayment agreement that requires plaintiff to repay defendant for costs associated with his training, because he voluntarily resigned within three years of beginning the training. The parties dispute whether the MOA is in force and applies to plaintiff, and if so, whether the training repayment agreement violates the FLSA.

█ The third dispute is whether, under the FLSA and Wisconsin law, defendant was entitled to recover partial repayment from plaintiff in the fashion that it did. After plaintiff notified defendant that he was resigning, defendant withheld all money, nearly $2,300, from plaintiff's final three weeks of pay (and accrued vacation pay) to recoup part of the more than $7,600 that it alleged was due. Plaintiff asserts that this conduct violated Wis. Stat. § 109.03. In addition, although the parties did not brief the issue, it is apparent that defendant's conduct in this regard also implicates the FLSA. I may grant summary judgment based upon a legal argument that the moving party did not raise, so long as judgment is not based upon the non-moving party's failure to support its factual position with adequate evidence. *Bd. of Nat'l Missions of Presbyterian Church in the United States v. Smith*, 182 F.2d 362, 364–65 (7th Cir.1950); *Shurr v. A.R. Siegler, Inc.*, 70 F.Supp.2d 900, 911 n. 6 (E.D.Wis.1999).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis omitted). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991).

█ The fact that both parties have moved for summary judgment, and thus both parties simultaneously argue that there is no genuine issue of fact, does not establish that a trial is unnecessary or empower me to enter judgment as I see fit. 10A Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice & Procedure* § 2720 at 327–28 (3d ed.1998). I may grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law on the basis of the material facts not in dispute. *Mitchell v. McCarty*, 239 F.2d 721, 723 (7th Cir.1957). Cross-motions for summary judgment do not convert a dispute into a question of law if material factual questions are involved and additional evidence may be adduced at trial which would

be helpful in the disposition of the case. *M. Snower & Co. v. United States*, 140 F.2d 367 (7th Cir.1944). The proper procedure is to assess the merits of each summary judgment motion independently. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on its own motion does not automatically indicate that the opposing party has satisfied its burden and must be granted summary judgment on the other motion. 10A Wright et al. § 2720 at 335.

### III. ANALYSIS

**A. Overtime Compensation**

**1. Applicability of State Notice of Claim Statute to Federal FLSA Claims**

Defendant contends that plaintiff's FLSA claim is barred because he did not file a timely notice of claim pursuant to Wis. Stat. § 893.80. This statute provides that no action may be brought against a governmental subdivision, such as a municipality, unless a claimant files a written claim within 120 days of the event giving rise to the claim. Wis. Stat. Ann. § 893.80(1)(b) (West Supp.2000). Plaintiff filed his notice of claim in September 1999, long after the 120–day notice of claim period for any claims arising from 1997. Defendant accordingly contends that any such claims are barred.

However, state procedural rules may not be used to defeat a federal right. *Brown v. W. Ry. Co. of Ala.*, 338 U.S. 294, 296, 70 S.Ct. 105, 94 L.Ed. 100 (1949). In *Felder v. Casey*, 487 U.S. 131, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988), the Supreme Court squarely held that non-compliance with the very statute at issue here, § 893.80, did not bar claims brought under federal law. *Felder* governs the present case. Congress enacted the FLSA to promote and maintain a standard of living necessary for workers' health, efficiency, and general well-being, 29 U.S.C. § 202(a), and granted workers a two-year statute of limitations (three years for willful violations), 29 U.S.C. § 255(a). Non-compliance with a state notice of claim statute does not bar FLSA claims against governmental subdivisions (or, at any rate, against municipal corporations or other governmental entities which are not arms of a state, *Alden v. Maine*, 527 U.S. 706, 756, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999)). *See also Mitchell v. La Barge*, 257 A.D.2d 834, 684 N.Y.S.2d 10, 11 (App. Div.1999) (holding that, under *Felder*, FLSA claim against municipality was not barred by New York State notice of claim statute).[1]

**2. FLSA Overtime Requirements**

Under the FLSA, employers must pay non-exempt employees overtime at one and one-half times their regular rate ("time-and-a-half") for all hours in excess of specified "maximum hour" limits. 29 U.S.C. § 207(a)(1). Public agencies employing law enforcement personnel and

---

**1.** Defendant asserts that the Seventh Circuit distinguished between applying § 893.80 to federal civil rights claims versus other federal claims in *Medley v. City of Milwaukee*, 969 F.2d 312 (7th Cir.1992). The Seventh Circuit there held that § 893.80 was properly applied to the plaintiffs' *state law* claims. *Id.* at 316, 320–21. The present defendant mistakenly states that the Seventh Circuit applied § 893.80 to a federal Housing Act claim against the municipality; the *Medley* plaintiffs' only Housing Act claim was their second claim, *id.* at 316, and the decision does not discuss any application of § 893.80 to that claim.

firefighters may set a work period of between 7 and 28 days, and the Department of Labor establishes the relevant maximum hours thresholds. 29 U.S.C. § 207(k). Defendant's work period is 27 days, and the corresponding maximum hours threshold is 204 hours. 29 C.F.R. § 553.230(c) (2000). (This corresponds to approximately 52.9 hours per week.) Thus, plaintiff was entitled to time-and-a-half for all hours worked in excess of 204 hours per 27-day work period.

Defendant used the so-called "California plan," under which employees work three 24-hour shifts each nine-day duty cycle (with one day on, one day off, one day on, one day off, one day on, and four days off). There were thus three full duty cycles each 27-day work period, and each firefighter worked nine 24-hour shifts every 27 days, for a total of 216 hours per 27-day work period. (This corresponds to 56 hours per week.) Defendant acknowledges that it was required to pay overtime for the difference between 204 and 216 hours in each 27-day work period; and plaintiff has no dispute with defendant's computation of his time-and-a-half for those hours.

The parties disagree over how plaintiff's time-and-a-half for overtime hours beyond 216 hours should have been computed. The dispute hinges upon what plaintiff's salary paid for. Three types of salary described in Department of Labor regulations are relevant here: "flat salary," "fluctuating workweek," and "variable workweek."[2] Employees receive a fixed salary under all three methods. Flat-salary employees' salary is for a regular number of hours per workweek; fluctuating workweek employees' salary is for a fluctuating number of hours per workweek; and variable workweek employees' salary is for a variable number of hours up to an agreed number of hours per week. 29 C.F.R. §§ 778.113, 778.114, 778.306(b), 778.323, 778.325. Flat-salary and variable workweek employees' salary is compensation only for the regular number of hours per workweek, and thus is not compensation for any additional hours of overtime. §§ 778.113, 778.323. Accordingly, flat-salary and variable workweek employees are entitled, in addition to their salary, to full time-and-a-half compensation for any overtime hours. §§ 778.113, 778.323, 778.325. By contrast, fluctuating workweek employees' salary is by definition "straight time" compensation for whatever hours the employee is called upon to work during the workweek, no matter whether great or few. § 778.114(a). Thus, in addition to their salary, fluctuating workweek employees are entitled only to "half-time" for any overtime, id., rather than the time-and-a-half to which flat-salary and variable workweek employees are entitled. As relevant here, the essence of the flat-salary and variable workweek methods is that salaries pay for straight time only for an agreed-upon, constant number of hours each week, § 778.113, or only for all hours up to an agreed-upon, constant number of hours each week, §§ 778.306(b), 778.323, 778.325. By contrast, the essence of the fluctuating workweek method is not merely that employees work a fluctuating number of hours, but rather that their salary is straight time pay for *all* hours worked, no matter whether great or few, § 778.114(a). *See, e.g., Flood v. New Hanover County,* 125 F.3d 249, 252–53 (4th Cir.1997) (holding that fluctuating workweek method applied even though employees' hours fluctuated pursuant to a written, fixed, regular,

---

**2.** Under 29 C.F.R. § 553.233, "work period" is to be substituted for "workweek" when applying overtime regulations to public agency firefighters. This substitution later becomes important, but I use the "workweek" terminology for the time being.

repeating and perpetual schedule). To protect workers, the fluctuating workweek method may be used only if there is a clear mutual understanding. § 778.114(a).

### a. Analysis of Contract

██ The parties' obligations are set out in a collective bargaining agreement between plaintiff's union and defendant. (Pohlman 11/9/2000 Aff. [R. 32] [hereinafter Pohlman 1st Aff.] Ex. E [hereinafter "CBA"].) Defendant emphasizes that the CBA refers to a fluctuating number of hours per week: "The normal work week shall consist of fifty-six (56) hours on an average basis. The normal work day shall consist of a twenty-four (24) hour consecutive shift." (*Id.* at 17.) (These provisions are consistent with the California plan discussed above, under which employees work either 48 or 72 hours in any given week and average 56 hours per week.) The reference to an "average" number of hours in a "normal" week, defendant contends, demonstrates that the parties agreed upon the fluctuating workweek method.

But the CBA's reference to an average of 56 hours per week is irrelevant for two reasons. First, as noted above, the regulations governing public agency firefighters require substituting "work period" for "workweek" throughout the regulations governing overtime compensation. 29 C.F.R. § 553.233. Thus, it makes no difference whether the parties expected plaintiff's hours per *week* to fluctuate. (And in fact, they expected plaintiff to work a constant, non-fluctuating 216 hours each work period.)

Secondly, and more fundamentally, what matters is not whether the parties agreed that plaintiff's hours would fluctuate, but whether they agreed that plaintiff's *salary* was his full straight-time compensation for *all* hours worked in each work period, no matter whether great or few. 29 C.F.R.

§ 778.114(a). That the parties knew that plaintiff's hours would fluctuate does not mean that they agreed on what hours his salary would cover. An expectation of a fluctuating number of hours is just as consistent with the flat-salary and variable workweek methods as with the fluctuating workweek method. Determining whether the parties agreed that plaintiff's salary would be his entire straight-time pay for *all* hours worked requires analyzing the contract's provisions regarding the number of hours plaintiff was to work together with its provisions regarding compensation and overtime.

Concerning compensation, the CBA specifies only that firefighters were to be paid a "salary"; it is silent as to how many hours the salary would pay for. Although the contract refers to an average number of hours to be worked in a normal week, it does not state that plaintiff's salary would cover all hours worked. Thus, it does not express an agreement that plaintiff's salary was his entire straight time payment for all hours worked. *Dingwall v. Friedman Fisher Assocs., P.C.,* 3 F.Supp.2d 215, 221 (N.D.N.Y.1998) ("There is no evidence in the record that plaintiff clearly understood that his salary was intended to compensate him for any hours worked. To the contrary, the employee manuals distributed at various times during plaintiff's employment all state . . . that 'staff personnel are normally expected to work a 40 hour week with the exception of preestablished holidays.' "). By contrast, in *Griffin v. Wake County,* 142 F.3d 712, 716 (4th Cir. 1998), the court emphasized, in finding that the parties agreed upon the fluctuating workweek plan, that the employer provided workers with an explanatory memorandum that "indicates—twice—that the weekly base salary reflects straight-time pay for 'whatever' number of hours were worked during the week and provides sam-

ple calculations of overtime under the plan."

And there is more. The CBA specifies that overtime compensation "shall be compensated by overtime pay which is defined as one and one-half (1½) times straight time hourly pay." (CBA at 18.) (The language quoted is from the clause regarding the first of six kinds of overtime; the language for the other categories is similar or identical.) By comparison, the Seventh Circuit found that there was a clear mutual understanding that the fluctuating workweek method was being used where the contract stated, "[y]ou will receive half (½) of the weekly hourly rate on all hours worked in excess of 40 per week." *Condo v. Sysco Corp.*, 1 F.3d 599, 602 (7th Cir. 1993). Likewise in *Flood*, the employer gave each employee a memorandum "that clearly explained the fluctuating workweek payment method and that provided examples." *Flood*, 125 F.3d at 251.[3]

Thus, a contract provision that salaried workers will be paid time-and-a-half for overtime hours would seem per se to establish that the fluctuating workweek method is not being used, unless other provisions explicitly state that the employees' salary covers their straight time for all hours including overtime hours. I find that the CBA does not express a clear mutual agreement that the fluctuating workweek method was to be used.

### b. Course of Performance

■ Defendant argues that the parties' course of performance would establish that they agreed to use the fluctuating workweek method. Specifically, defendant asserts that it used that method to calculate

plaintiff's overtime and argues that because plaintiff did not complain about it until 1999 (and even then only after his final pay was withheld under the training repayment agreement), plaintiff indicated his acceptance of the fluctuating workweek method.

■ There are three difficulties with such a course-of-performance argument. First, the goal of contract interpretation is to determine the intent of the parties at the time the agreement was entered into, rather than at the time of performance. *Capital Invs., Inc. v. Whitehall Packing Co.*, 91 Wis.2d 178, 190, 280 N.W.2d 254 (Wis.1979). As one commentator observes, "[i]t is not easy to explain why subsequent conduct should be relevant to what the parties intended when the contract was made." 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 7.14 at 321 (2d ed.1998). Defendant relies upon *Griffin*, 142 F.3d at 716–17, where the court used emergency medical technicians' receipt of full salary even for short weeks as confirming that the EMTs understood and accepted the fluctuating workweek method. (Employees' receiving their full salary in short weeks is, of course, just as consistent with the variable workweek method as with the fluctuating workweek method.) However, the *Griffin* court discussed the EMTs' conduct as evidence of the parties' understanding only after it concluded, based upon the employer's explanatory memoranda and mandatory meetings to explain the fluctuating workweek method, that this was already the parties' understanding. *Id.* at 716. *Griffin* therefore is not at odds with the rule that the parties'

---

**3.** Similarly, the Department of Labor advised that a memorandum of understanding demonstrated a clear mutual understanding of the fluctuating workweek method because it "state[d] clearly that the foremen and assistant foremen would be paid a salary for all hours worked in any workweek and would then be paid an additional one-half (½) time for hours worked in excess of 40." DOL Opinion Letter, [6A Wages–Hours Man.] Lab. Rel. Rep. (BNA) 99:5381, *available at* 1999 WL 1002399 (May 10, 1999).

course of performance may be looked to only after assessing the parties' contract.

■ Second, a court should be careful in using the parties' actions after a contract is executed as an aid to interpreting the parties' original intention, particularly the actions of one party not concurred in by the other. *Jennings v. Gen. Med. Corp.,* 604 F.2d 1300, 1306 (10th Cir.1979).

■ Third, extrinsic evidence, such as the parties' course of performance, is admissible to determine the intent of the parties only if the contract is ambiguous. *Mielke v. Nordeng,* 114 Wis.2d 20, 23–24, 337 N.W.2d 462 (Ct.App.1983). (However, a party may proffer extrinsic evidence to establish that a seemingly clear contract provision is in fact ambiguous. *AM Int'l, Inc. v. Graphic Mgmt. Assocs., Inc.,* 44 F.3d 572, 574, 577 (7th Cir.1995).) A contract is ambiguous if its terms are reasonably susceptible to more than one construction. *Gorton v. Hostak, Henzl & Bichler, S.C.,* 217 Wis.2d 493, 506, 577 N.W.2d 617 (1998). Where a contract is clear, the court must construe the contract as it stands even if the parties interpreted it differently. *Hortman v. Otis Erecting Co.,* 108 Wis.2d 456, 461, 322 N.W.2d 482 (Ct.App.1982) (quoting *Dykstra v. Arthur G. McKee & Co.,* 92 Wis.2d 17, 38, 284 N.W.2d 692 (Ct.App.1979)). *See also In re Chicago & E.I.R. Co.,* 94 F.2d 296, 300 (7th Cir.1938) ("If by mistake the parties followed a practice in violation of the terms of the agreement, the court should not perpetuate the error."). Thus, the court will look to the practical construction the parties placed upon a contract 'term only if the term is ambiguous. *Shanks v. Blue Cross & Blue Shield United of Wis.,* 777 F.Supp. 1444, 1448

(E.D.Wis.1991), *aff'd,* 979 F.2d 1232 (7th Cir.1992) (per curiam).

However, under the relevant regulations, the fluctuating workweek method may be used only if "there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period." § 778.114(a). Moreover, the method cannot be used "unless the employee clearly understands that the salary covers whatever the job may demand in a particular workweek." § 778 .114(c). It will be a rare case in which the parties have a clear mutual understanding that the employee's salary is to be his or her entire straight-time payment for all hours, including overtime hours, but nonetheless enter into a written contract that is reasonably susceptible of being constructed as agreeing that the employee's salary was payment for straight-time hours only up to an agreed-upon level.

In this case, the CBA provides that plaintiff was to be paid "salary" but does not specify that the salary was straight-time payment for all hours, including overtime; that he was to work an "average" and "normal" of 56 hours per week; and that he was to be paid overtime at time-and-a-half. Defendant's proffered evidence of plaintiff's pay-stubs, hour sheets, and deposition testimony does not establish that the CBA is reasonably susceptible of being construed as an agreement that plaintiff's salary was his entire straight-time payment for all hours worked, including overtime, much less that plaintiff had a clear understanding of this when he entered into employment with defendant.[4]

---

4. Plaintiff testified during his deposition that he would be paid his full salary if he worked a short work period of 204, 192, 190, 182, or

180 hours, rather than his norm of 216 hours under the California plan. As discussed above, full salary for short work periods is

Plaintiff is entitled to summary judgment on his FLSA claim for full time-and-a-half, in addition to his salary, for all hours worked over 216 per 27–day work period.

## B. Reimbursement for Training Costs

The parties' second dispute arises from a memorandum of agreement ("MOA") signed May 30, 1997, with a stated effective date of February 1, 1997. Under the MOA, all employees were required to be licensed as paramedics, and those not currently so licensed were expected to complete all necessary training by approximately October 1, 1997. (Pohlman 1st Aff. Ex. D [hereinafter "MOA"] para. 1.) Effective January 1, 1998, all firefighters who had been certified as paramedics were to receive additional compensation of 3% of their base salary, paid bi-weekly, rising to 3.5% January 1, 1999. (*Id.* paras. 6–7.) The MOA stated that "[s]uch stipend shall not be considered to be an addition to base salary." (*Id.* para. 6.) Finally, firefighters who voluntarily resigned within three years of starting their paramedic training were required to repay defendant "an amount equal to the cost of tuition, books and other training costs for the paramedic training, plus liquidated damages in an amount equal to the overtime wages paid as a part of such training and any paramedic premium pay received from the City following paramedic certification." (*Id.* para. 8) [hereinafter "training repayment agreement"].

Plaintiff resigned two-and-a-half years after his paramedic training began. Because this is less than three years, defendant contends that plaintiff owes the amounts specified in the training repayment agreement. Plaintiff argues that he never agreed to be bound by the MOA; that the MOA is not operative because the union membership did not ratify it; that the MOA, signed on May 30, 1997, could not deprive him retroactively to its purported effective date of February 1, 1997 of benefits that previously vested to him; and that the MOA's training repayment agreement is void because it violates the FLSA.

### 1. Applicability and Retroactive Force of Memorandum of Agreement

■■■■■ Plaintiff first contends that he is not bound by the MOA because he did not personally agree to it. However, he does not dispute that his union was the recognized or certified exclusive collective bargaining representative of employees in his bargaining unit under the Wisconsin Municipal Employment Relations Act (MERA), Wis. Stat. Ann. § 111.70(3)(b)(3) (West Supp.2000). On that basis, he is bound by any valid collective bargaining agreements that the union entered with defendant. § 111.70(3)(b)(4). A memorandum of understanding is one form of collective bargaining agreement under the MERA. *Bence v. City of Milwaukee*, 107 Wis.2d 469, 486, 320 N.W.2d 199 (1982).

just as consistent with the variable workweek method as with the fluctuating workweek method.

I do not take the pay-stubs proffered by defendant at face value, because (presumably as an artifact of defendant's payroll system) they show plaintiff as working 80 "regular" hours every two weeks, rather than the 112 hours that it is undisputed he worked at 56 hours/week under the California plan. None-

theless, they show plaintiff's "regular" hour rate as $15.39/hour, and his "overtime" rate as $23.09/hour—one-and-a-half times the regular rate. This tends to confirm that the parties were using the variable or the flat-salary method, and undermines defendant's claim that they were using the fluctuating workweek method. Defendant's evidence does not establish that the terms of the CBA were ambiguous.

Even if plaintiff did not personally agree to the MOA, he is bound by it.

 Plaintiff next contends, and defendant does not dispute, that the union membership never voted to ratify the MOA. However, as stated above, plaintiff does not dispute that the union was his exclusive bargaining representative. Plaintiff identifies no provision of the MERA that requires employee ratification before a collective bargaining agreement takes force, and identifies no other reason that such ratification would be required, such as its being required by the union's internal constitution, *Merk v. Jewel Food Stores Div. of Jewel Cos.*, 945 F.2d 889, 896 (7th Cir.1991) (applying Federal Labor Management Relations Act), or that the parties to the agreement specifically agreed that employee ratification would be required before the agreement took effect, *N.L.R.B. v. Roll & Hold Div., Area Transp. Co.*, 957 F.2d 328, 331 (7th Cir. 1992) (same). Absent such circumstances, the MOA is binding notwithstanding that it was not submitted to the union membership for ratification.

 Plaintiff's third contention is that because the MOA was not signed until May 30, 1997, it could not deprive him of benefits that accrued to him prior to that date. This argument is baseless. "Labor contracts are often back-dated for the purpose of retroactive application of economic items such as wage increases. Indeed, as we noted above, 'retroactivity is a way of life in labor negotiations.'" *Sauk County v. Wis. Employment Relations Comm'n*, 165 Wis.2d 406, 417, 477 N.W.2d 267 (1991) (quoting *Berns v. Wis. Employment Relations Comm'n*, 99 Wis.2d 252, 266, 299 N.W.2d 248 (1980)). Plaintiff makes no claim that the training repayment agreement at issue here was not an economic item under the MERA, and the parties were entitled to give it retroactive effect.

## 2. Enforceability of Training Repayment Agreement

### a. Standard for Decision

Plaintiff contends that terms of the training repayment agreement violate the FLSA and therefore cannot be enforced. The Wisconsin courts have not addressed when training repayment agreements are enforceable, thus it is necessary to survey other jurisdictions. Employee training is often classified as either "general" or "specific"; general training is defined as training that is useful in employment for more than the current employer, while specific training is of use only to the employer providing it. Gary S. Becker, *Human Capital* 33, 40 (3d ed.1993). Because general training by definition is of use to employees in seeking other work, some economic theorists suggest that employees receiving general training are paid lower wages to offset the value of that training. *Id.* at 34–40; Peter H. Rubin & Peter Shedd, *Human Capital and Covenants Not to Compete*, 10 J. Legal Stud. 93 (1981).

However, a growing number of employers are requiring employees to pay for the value to them of the general training they receive, less the value to the employer of their having received the training. Such training repayment agreements generally forgive the employee's financial obligation over a period of one to several years, usually by crediting the employee with partial repayment for each successive period that he or she remains on the job. If the worker leaves before the end of the specified period, the remaining balance becomes due. Anthony W. Kraus, *Repayment Agreements for Employee Training Costs*, 44 Lab. L.J. 49, 49–50 (1993).

At least two states have outright banned

such contracts.[5] Connecticut has declared void as against public policy any agreement requiring an employee to pay an employer a sum of money for leaving within a specified time period. Conn. Gen. Stat. Ann. § 31–51r (West 1997). (However, it appears that collective bargaining agreements including such provisions are enforceable. *Id.* § 31–51r(c)(4).) And in *Sands Appliance Services, Inc. v. Wilson,* 463 Mich. 231, 615 N.W.2d 241 (2000), the Michigan Supreme Court found that a training repayment agreement was void because it violated a state statute forbidding employers from receiving kick-backs from workers for continued employment.

*Sands Appliance* is not directly applicable in the present case. Under Wis. Stat. § 105.04, employers may not accept money from applicants for employment, but the statute is silent as to whether, once an applicant has been hired, an employer may begin requiring kick-backs for continued employment. However, an employer may not circumvent § 105.04 by requiring applicants to agree to make payments during the course of employment, or after leaving employment, as a condition of receiving the job. *N.J. Transit Auth. v.*

*N.J. Transit PBA, Local 304,* 314 N.J.Super. 129, 714 A.2d 329, 333 (App.Div.1998).

Some training repayment contracts require repayment only if the employee leaves to work for a competitor. Such agreements are a type of restrictive covenant and therefore receive the rigorous scrutiny that courts apply to such covenants. *Brunner v. Hand Indus., Inc.,* 603 N.E.2d 157, 159 n. 1, 160–61 (Ind.Ct.App. 1992) (agreement requiring repayment only if employee went to work for competitor was a restrictive covenant and was unenforceable because employer did not have protectible interest in employee's general knowledge under Indiana restrictive covenant law).[6] By contrast, in *Milwaukee Area Joint Apprenticeship Training Comm. for Elec. Indus., v. Howell,* 67 F.3d 1333, 1339 (7th Cir.1995), the court found that an electrician's repayment obligation to a union apprentice training program was not a restrictive covenant under Wisconsin law, because it was not contingent upon working for a competitor, or within a certain industry, or within a geographic area. The court held that the agreement was a fully enforceable debt that simply provided the worker with the option to pay part or all of his obligation through in-kind service. *Id.* at 1339–40.[7]

---

**5.** In addition, at least two other states impose statutory restrictions upon training repayment agreements. Colorado applies such agreements only to employees who leave an employer within two years of starting service. Colo.Rev.Stat. Ann. § 8–2–113(2)(c) (West 1994). Florida allows restrictive covenants that require employees leaving to work for competitors to repay expenses for "extraordinary or specialized training" as "legitimate business interests," but requires proof that the terms of the repayment agreement are "reasonably necessary" to protect the employer's interests. Fla. Stat. Ann. §§ 542.235(1)(b)(5), (1)(c) (West 1997). Applying this statute, a federal district court enforced a police officer's training repayment agreement that obliged her to repay training costs if she left within three years of complet-

ing field training. *Matthews v. City of Gulfport,* 72 F.Supp.2d 1328, 1341 (M.D.Fla. 1999).

**6.** *See also Heartland Sec. Corp. v. Gerstenblatt,* No. 99 Civ. 3694(WHP), 2000 WL 303274, at *7, 2000 U.S. Dist. LEXIS 3496, at *17 (S.D.N.Y. Mar.22, 2000) (finding that if repayment agreement was merely intended to recoup training costs, it would have required repayment from employees no matter what they did after leaving the employer).

**7.** Similarly, in the opinion of the Louisiana attorney general, a training repayment agreement is not a restrictive covenant under a Louisiana statute if its repayment terms do not depend upon whether the employee goes to work for a competitor. La. Atty. Gen. Op.

 Even where a training repayment agreement is not a restrictive covenant, it must be scrutinized in a manner similar to that applied to restrictive covenants. Restrictive covenants are subject to rigorous scrutiny due to public policy concerns regarding employee mobility and the public's right to "have the benefit of the services and business ability of everyone everywhere"; against these concerns is balanced the employer's right to protection. *Milwaukee Linen Supply Co. v. Ring*, 210 Wis. 467, 472, 246 N.W. 567 (1933). Covenants not to compete are therefore subject to a reasonableness test, under which the courts will enforce non-competition agreements that are "reasonably necessary for the fair protection of the employer's business or rights, and not unreasonably restricting the rights of the employee, due regard being had to the interests of the public and the circumstances and conditions under which the contract is to be performed." *Id.* at 473, 246 N.W. 567 (quoting *Samuel Stores, Inc. v. Abrams*, 94 Conn. 248, 108 A. 541, 543 (1919)). Wisconsin later codified this common law rule, and enforces non-compete agreements as to "a specified territory and during a specified time ... only if the restrictions imposed are reasonably necessary for the protection of the employer." Wis. Stat. Ann. § 103.465 (West Supp. 2000).

 The same public policy concerns that led to the earlier common law of restrictive covenants arise in the context of training repayment agreements. Such agreements obviously restrict an employee's freedom to leave employment and reenter the labor market while effectively reducing the amount of compensation the

employee receives, *N.J. Transit Auth.*, 714 A.2d at 333, and obstruct the public's right to the benefits of free and unfettered competition. Accordingly, training repayment agreements are subject to similar reasonableness requirements. *Voorhees v. Guyan Mach. Co.*, 191 W.Va. 450, 446 S.E.2d 672, 677 n. 2 (1994) (employer may draft "a reasonable contract" allowing recovery of investment in employee's training, particularly because employee training is in the public interest); Katherine V.W. Stone, *The New Psychological Contract: Implications of the Changing Workplace for Labor and Employment Law*, 48 UCLA L.Rev. 519, 586–92 (2001). (They are also, of course, subject to contract law's requirements regarding duress, unconscionability, and consideration, the last of which is especially pertinent for agreements entered after employment has begun. Such factors are likely to loom larger where employment is at-will or the employee is not protected by a collective bargaining representative; neither is true here.)

 Courts must scrutinize training repayment agreements in terms of amount, duration, schedule of repayment credit for time worked, and other terms, to ensure that they are reasonably necessary to protect the employer's interests and are commensurate with the benefits secured to the employee. *City of Pembroke v. Hagin*, 194 Ga.App. 642, 391 S.E.2d 465, 467 (1990) (enforcing police officer training repayment agreement, where obligation fully forgiven after 12 months' employment, after finding that "the agreement at issue in this case is reasonably related to the City's interest in protecting its investment in training a new officer").[8] The amount to

No. 93–277 (1993), 1993 La. AG LEXIS 279, 1993 WL 661372.

**8.** Thus Lord Mustill (then Lord Justice), in delivering the decision of England's highest court, held that the same scrutiny that governs restrictive covenants must be applied to training repayment agreements:

be repaid for any training must be commensurate with the actual cost to the employer of providing that training. *Falmouth OB–GYN Assocs. v. Abisla,* 417 Mass. 176, 629 N.E.2d 291, 292 (1994); *Med + Plus Neck and Back Pain Ctr., S.C. v. Noffsinger,* 311 Ill.App.3d 853, 244 Ill. Dec. 712, 726 N.E.2d 687, 693 (2000); *Reddy v. Cmty. Health Found. of Man,* 171 W.Va. 368, 298 S.E.2d 906, 914 (1982) (car-repair garage would be entitled to contract for repayment of training costs if it sent unskilled worker to Detroit for six-month course in car repair, but not if its mechanic's assistant picked up the rudiments of auto repair by hanging around the shop). Among the factors to be considered are the fact that employers subject to income tax may take current deductions for the full cost of ordinary and necessary training expenses, 26 U.S.C. § 162; Rev. Rul. 96-92, 1996–2 C.B. 9, and the fact that employers may use the offer of general training as a recruitment tool, Stone, *supra,* 48 UCLA L.Rev. at 591.[9]

 The duration of the worker's obligation to remain with the employer must be reasonably related to the actual cost of training, Kraus, *supra,* 44 Lab. L.J.

at 52, and to the time needed for the employer to amortize or recoup its investment, *Reddy,* 298 S.E.2d at 917; *Orkin Exterminating Co. v. Foti,* 302 So.2d 593, 598 n. 3 (La.1974). An amortized repayment schedule, that is, one that gives the employee repayment credit for each successive period of time worked, increases the likelihood that a repayment agreement will be found reasonable. *Med + Plus,* 244 Ill.Dec. 712, 726 N.E.2d at 693; *Strathclyde Reg'l Council v. Neil,* 1983 S.L.T. (Sh.Ct.) 89, 93 (Scot.); Kraus, *supra,* 44 Lab. L.J. at 53.

**b. Discussion**

I now apply this standard to the present case. I first look to the amount to be repaid. The portion "equal to the cost of tuition, books, and other training costs for the paramedic training" is not problematic (although I observe that the parties dispute whether a local hospital, rather than defendant, paid these costs).

 I next assess plaintiff's argument that the portion calling for "liquidated damages in an amount equal to the overtime wages paid as a part of such

So I would hold that the question to be answered … is: "Was the bargain fair?" The test of fairness is, no doubt, whether the restrictions are both reasonably necessary for the protection of the legitimate interests of the promisee and commensurate with the benefits secured to the promisor under the contract. . . .
… The fact that the appellants' bargaining power vis-a-vis the respondent was strong enough to enable them to adopt this take-it-or leave-it attitude raises no presumption that they used it to drive an unconscionable bargain with him, but in the field of restraint of trade it calls for vigilance on the part of the court to see that they did not.
*Elec. Data Sys., Ltd. v. Hubble* (Eng.C.A.1987) (LEXIS, Enggen Library, Engcas file) (quoting *Macaulay v. Schroeder Music Publ'g Co.,*

[1974] 1 W.L.R. 1308, [1974] 3 All E.R. 616 (U.K.) (Lord Diplock)).

**9.** The amount to be repaid also depends upon the extent to which the employee accepted lower wages in exchange for training. Michael J. Trebilcock, *The Common Law of Restraint of Trade: A Legal and Economic Analysis* 131 (1986). *See also* Gillian Lester, *Restrictive Covenants, Employee Training, and the Limits of Transaction–Cost Analysis,* 76 Ind. L.J. 49, 69–71 (2001) (arguing that Trebilcock identifies the right questions, but critiquing his solution as complicated to apply in practice). It appears to me that evidence that an employer paid higher wages than similarly-situated employers that did not require training repayment agreements would support the employer's claim that the amount to be repaid under its agreement was reasonably necessary.

training and any paramedic premium pay received from the City following paramedic certification" violates the FLSA. Employees cannot abridge or waive their rights under the FLSA. *Brooklyn Sav. Bank v. O'Neil,* 324 U.S. 697, 707, 65 S.Ct. 895, 89 L.Ed. 1296 (1945); *see also Barrentine v. Arkansas–Best Freight Sys., Inc.,* 450 U.S. 728, 740–41, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) ("congressionally granted FLSA rights take precedence over conflicting provisions in a collectively bargained compensation arrangement"). Accordingly, no effect can be given to training repayment agreements that are in violation of the FLSA.

■■■ The MOA asserted that the paramedic premium, which was calculated as a percentage of firefighters' base salary and was paid every two weeks, was a "stipend" that "shall not be considered to be an addition to base salary." However, under the FLSA, an employee's regular rate includes "all remuneration" other than specific types of payments, 29 U.S.C. §§ 207(e)(1)—(e)(7), and nondiscretionary regular weekly cash payments, no matter how labeled, are not among the allowable exceptions, 5 *Emp. Coordinator* (West) ¶ C–16,151 (Sept. 13, 2000). Accordingly, the MOA's agreement not to consider firefighters' paramedic premiums as part of their base salary violated the FLSA, and therefore is preempted; the premiums were part of the firefighters' contracted-for wages. DOL Opinion Letter, [6A Wages–Hours Man.] Lab. Rel. Rep. (BNA) 99:5399, question 2 at 99:5540, *available at* 1999 WL 1788163 (Sept. 30, 1999).[10] The FLSA's overtime requirements are not satisfied unless overtime and all straight-time wages are fully paid and fully based upon the employee's contracted-for wage.

*Reich v. Midwest Body Corp.,* 843 F.Supp. 1249, 1252 (N.D.Ill.1994); 29 C.F.R. § 778.315. Wages must be paid "free and clear," and an employer's requiring an employee to repay "the whole or part of the wage delivered to an employee" is an illegal kick-back. 29 C.F.R. § 531.35. It was thus a transparent violation of the FLSA for defendant to require any part of a firefighter's regular wages or overtime compensation to be repaid if he or she resigned within a specified time. Any provisions of a training repayment agreement that violate the FLSA are per se unreasonable and will not be enforced.

■■■ Defendant argues that what the training repayment agreement required was not the repayment of wages or overtime compensation, but instead the payment of liquidated damages in a sum equal to specified wages and overtime compensation. This argument is unavailing. It is the substance of a contract, rather than its mere form, which determines whether it complies with the FLSA. *Murray v.. Noblesville Milling Co.,* 131 F.2d 470, 473 (7th Cir.1942).

■■■ The agreement's duration of three years, calculated from the start of plaintiff's half-year paramedic training, does not appear unreasonably long in the circumstances. *See, e.g., Matthews,* 72 F.Supp.2d at 1341 (enforcing agreement requiring repayment if employee resigned within three years of completing all police officer field training); *Carlson Ambulance Transport v. Fischbach,* No. 2699–M, 1998 WL 178556, 1998 Ohio App. LEXIS 1556 (Ohio Ct.App. Apr. 15, 1998) (enforcing agreement requiring repayment if employee resigned within two years of finishing paramedic training and becoming certified

---

**10.** Thus, the Department of Labor opinion letter makes clear that the regular rate on which firefighters' overtime compensation is

based must include any paramedic premiums calculated as a percentage of their base salary. *Id.*

as paramedic). However, I find that the absence of a proportionate reduction in the amount due over this three-year period shows that the agreement was a penalty intended to induce plaintiff to remain in defendant's employ, rather than reasonably necessary to reimburse defendant for training costs that it had not yet recovered. *Med+Plus,* 244 Ill.Dec. 712, 726 N.E.2d at 693 (finding amount to be repaid a penalty intended to prevent employee from leaving, rather than recoupment of training expenses, because it bore no relation to employer's unrecovered training costs).[11]

I therefore conclude that the agreement is unenforceable insofar as it required repayment of any portion of wages or overtime, even though the agreement labeled this as "liquidated damages." I further conclude that it is unenforceable insofar as it did not reduce the amount due over the years that it was in force.

### C. Propriety of Recouping Debt from Employee's Last Paychecks and Accrued Vacation Time

■ The training repayment agreement provided that "such amounts [as are due] may be collected by the City from any moneys owed by the City to such employee as a part of his/her termination payment." Defendant combined into a single pay-stub the amounts due to plaintiff for his unused vacation time and his last two pay periods (one a full two-week period, the other a one-week period). (Compl.Ex. C.) After subtracting various deductions owed for taxes, union dues, health insurance, and the like (but not a Wisconsin Retirement contribution that

plaintiff asserts was required), nearly $2,300 remained. Defendant made a final deduction entitled "adjust" for the entire amount, and so plaintiff's net pay for his final three weeks' wages (and unused vacation pay) was zero.

Plaintiff contends that defendant's making these deductions from his final paychecks violated Wis. Stat. § 109.03(2). This statute requires that a departing employee must be paid in full. Defendant's only response is that the training repayment agreement authorized it to make the deductions it did from plaintiff's final pay. However, as we have seen, the training repayment agreement would be enforceable at most to the extent of books and tuition, and even then only if plaintiff received credit towards the amount due for successive periods of time worked. Defendant asserts that it spent $1,424.77 towards plaintiff's tuition and books; assuming that defendant was properly owed a proportionate amount (1—[2½ years / 3 years] = 1/6) of this amount, defendant would have been entitled to withhold only $237.46 from plaintiff's pay, rather than the $2,281.21 that it actually withheld. Plaintiff is entitled to summary judgment on this claim.

■ In addition, it is clear that defendant violated the FLSA's minimum wage requirements. (As mentioned above, neither party briefed this issue, but it is a matter of law and does not rely upon defendant's failure to support its factual position with evidence. *Bd. of Nat'l Missions,* 182 F.2d at 364–65; *Shurr,* 70 F.Supp.2d at 911 n. 6). Employees must be paid at least the statutory minimum wage for each hour worked. 29 U.S.C.

---

11. Indeed, because one effect of the training repayment agreement was to force plaintiff to repay all paramedic premiums he earned after finishing his training, the amount to be repaid actually increased with time served, rather than decreased. This further confirms that the amount to be repaid was intended as a penalty and not recoupment of actual training costs.

§ 206(a)(1). An employer may not reduce a worker's wage below the statutory minimum to collect a debt to the employer. *Calderon v. Witvoet,* 999 F.2d 1101, 1107 (7th Cir.1993) (citing *Brennan v. Heard,* 491 F.2d 1 (5th Cir.1974), *overruled on other grounds by McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988); *Brennan v. Veterans Cleaning Serv., Inc.,* 482 F.2d 1362 (5th Cir.1973)). It is undisputed that this is precisely what defendant did for plaintiff's last three weeks of work. Plaintiff is therefore entitled to summary judgment under the FLSA's minimum wage requirements for such conduct.

## IV. CONCLUSION

**NOW, THEREFORE, IT IS HEREBY ORDERED** that plaintiff's motion for partial summary judgment on liability is **GRANTED** and that defendant's motion for summary judgment is **DENIED.**

**IT IS FURTHER ORDERED** that there will be a telephonic status conference at 1:30 p.m. on Thursday, June 28, 2001. The court will initiate the call.